[No. 14302. Department One. April 30, 1918.]

*In the Matter of the Guardianship of the Estate of*
MARTHA E. BAYER.[1]

INSANE PERSONS—GUARDIANSHIP—INCOMPETENCY—EVIDENCE—SUFFICIENCY. It is not necessary that a person be insane or an idiot, in order to authorize the appointment of a guardian because of incompetency to manage business affairs; and it is error to deny an appointment, where it appears that a widow, possessed of considerable means, had been taken care of in several private sanitariums on account of mental incompetency, and had been committed to and paroled from the state asylum for the insane, had sold a farm worth $45,000 to $50,000 for less than half its value, and acted irrationally and suffered from delusions; since an improvident business transaction should be taken into consideration along with other evidence.

Appeal from a judgment of the superior court for Lincoln county, Sessions, J., entered March 20, 1917, denying the appointment of a guardian for an incompetent person, tried to the court. Reversed.

[1]Reported in 172 Pac. 842.

*Samuel P. Weaver,* for appellant.

*Merritt, Lantry & Merritt* (*Clarence B. Willey,* of counsel), for respondent.

Main, J.—The petitioner, John Dotson, brought this action for the purpose of having a guardian appointed for the estate of his sister, Martha E. Bayer, claiming that Mrs. Bayer was incompetent to manage her own affairs. The cause was tried to the court without a jury, and resulted in a judgment denying the guardianship. From this judgment, the petitioner appeals.

The estate for which the guardianship was sought was a farm consisting of 960 acres of land in Lincoln county, this state. At the time of the trial of the action, Mrs. Bayer was approximately sixty-six years of age.

The question to be determined upon this appeal is not whether Mrs. Bayer was insane, but whether she was incapable of managing her business affairs by reason of mental unsoundness. It is not necessary that a person be an idiot or a lunatic in the strict sense of those terms before a guardian of the estate can be appointed. *In re Wetmore's Guardianship,* 6 Wash. 271, 33 Pac. 615; *In re Ervay,* 64 Wash. 138, 116 Pac. 591; *Shafer v. Shafer,* 181 Ind. 244, 104 N. E. 507.

The rule which is generally supported by the authorities is stated in 22 Cyc., page 1139, as follows:

"Generally speaking the test of whether a guardian should be appointed for the estate of a person is whether mental unsoundness exists to such a degree that he is incapable of conducting the ordinary affairs of life, so that to leave his property in his possession and control would render him liable to become the victim of his own folly or of the fraud of others. It is not necessary in most states that the person should be an idiot or a lunatic in the strict sense of those terms; . . ."

In some states, however, the rule is otherwise. With the law as thus stated, over which we think there is no

serious controversy, the question then to be determined is whether the evidence in this case shows that Mrs. Bayer was suffering from mental unsoundness to such a degree that she was incapable of conducting her business affairs.

In the spring or early summer of 1907, Mrs. Bayer, who was then living with her husband at their home in the northern part of the city of Seattle, was placed in a sanitarium at Portland, Oregon, for treatment for mental trouble. She returned in the fall of that year to her home, from which she was taken thereafter to another private sanitarium for the same trouble. While she was in this institution her husband, Dr. Bayer, died, and in December, 1908, a brother of hers, Jasper Dotson, was appointed her guardian. In April, 1910, the guardian caused Mrs. Bayer to be placed in the Puget Sound Sanitarium in Seattle for treatment on account of mental trouble or disease. About a year later, she was removed by the guardian to another sanitarium, where she remained for a period of about three months. In September, 1912, Mrs. Bayer was placed in the state institution for the insane at Steilacoom. About a month later, a sister, Mrs. Emmaretta McClanahan, instituted proceedings to have her released therefrom, and as a result of such proceedings, Mrs. Bayer was paroled and placed in the care of Mrs. McClanahan.

About the month of February, 1916, Mrs. Bayer went to Carter, Wyoming, where her condition and conduct were such that she was taken into custody by the sheriff, because it was thought by those who observed her condition that she was not able to take care of herself. After taking her into custody, the sheriff telegraphed a brother, Emanuel Dotson, at Belden, Nebraska, that his sister "was incompetent and has got to be taken care of." A telegram of like import

was sent to Mr. D. R. Cole, who, subsequent to the discharge of Mrs. Bayer from the asylum at Steilacoom, had been managing her farm under a power of attorney. Mr. Cole remitted money with which a ticket was purchased for Mrs. Bayer to go to her brother in Nebraska. There were two other brothers. One lived in the state of Oregon and the other at Cashmere, this state. After being with the brother in Nebraska for a few months, she sold and conveyed to him the Lincoln county farm with the crop thereon, which was worth between $45,000 and $50,000, for $3,000 cash, a note for $10,000, with interest at the rate of 5 per cent per annum, unsecured, and the assumption of a $7,000 mortgage which was then upon the farm. In other words, she sold the property for less than one-half of its value. The brother testified that he purchased it because his sister wanted to sell it, and "because it was a good buy." Subsequent to the time when Dr. Bayer died and up to the time when Mrs. Bayer went to Nebraska, when not confined in any institution for mental treatment, she lived at various places—a portion of the time with Mrs. McClanahan, another portion with the brother in Oregon, and also with the brother in Washington, and a nephew, who was operating the farm under a lease from her attorney in fact. She also spent some time in the state of California, as well as in Nevada. While at her brother's home in the state of Oregon, she refused to live in the house with the family, but lived in a little house that stood in the same yard. She refused to eat at the table with the family, but had her meals brought out to her, and then would not eat when any one was watching her. She would stay in bed with her clothes on, and often would not answer when spoken to. She would not take care of her room, bed or fire. While staying at the other places mentioned, the same peculiarities, and others,

characterized her conduct. She suffered a delusion that her husband was still alive. She would go out by the side of the street and play in the dirt. The evidence shows that, as a young woman, Mrs. Bayer was neat and careful of her dress and appearance, and that, since the death of her husband, she has become untidy and almost slovenly. The record not only contains the above facts, but much more of like import.

Upon the trial, Mrs. Bayer testified in her own behalf and sought to explain many of the things already referred to. She apparently, as a witness, seemed reasonably bright and competent. The expert alienists who testified on the respective sides of the case, as is not uncommon in such cases, expressed different views as to competency. The trial court, in denying the application for guardianship, seems to place considerable reliance upon the testimony of Mrs. Bayer and her appearance upon the witness stand, but the fact that she seemed a bright witness would not necessarily establish her competency to manage her business affairs. A child of immature years, incompetent, both in fact and in law, to conduct business affairs, may make the brightest of witnesses. Upon the trial in which Mrs. Bayer was released from the asylum for the insane, she also testified and, as the evidence shows, made a bright witness, but her condition thereafter was not different from what it had been prior to that time. So far as this record shows, the only business transaction that Mrs. Bayer ever had of any importance was the sale of the farm to her brother. As already pointed out, this was such a transaction as would not tend to support her business competency. It is not claimed, either by her or by her brother, who was the beneficiary of the transaction, that it was intended to be anything else than a pure business transaction. An improvident business transaction may be competent evidence in

support of an application for a guardianship, and should be taken into consideration, in connection with all the other evidence in the case, in determining the question of mental incompetency. *Shelby v. Farve,* 33 Okl. 651, 126 Pac. 764; *In re Chappel's Estate,* 189 Mich. 526, 155 N. W. 569.

In the case last cited it was said:

"An improvident business transaction may be competent evidence in support of an application for guardianship; most of the acts of a respondent in such a case are competent as going to show the mental condition. But such an improvident act becomes cogent proof of mental incompetency only as it is reinforced and explained by other facts and circumstances."

Without further reviewing the evidence it may be said that, after giving this record the most careful consideration, we are entirely convinced that the great weight of the evidence is to the effect that Mrs. Bayer was not competent to manage her business affairs, and that therefore the trial court erred in failing to appoint a guardian for her estate.

The judgment will be reversed, and the cause remanded with direction to the superior court to cause letters of guardianship to be issued.

ELLIS, C. J., FULLERTON, PARKER, and WEBSTER, JJ., concur.