[No. 22795. Department One. April 9, 1931.]

*In the Matter of the Guardianship of*
FRANCES CARLSON.[1]

*Shorett, Shorett & Taylor,* and *Roberts, Skeel & Holman,* for appellant.

*Reynolds, Ballinger, Hutson & Boldt,* for respondent.

HOLCOMB, J.—This is an appeal by the guardian from a decree by the court below disallowing the guardian's account, directing that the account be restated,

[1]Reported in 297 Pac. 764.

charging the guardian with the original inventory value of the ward's estate, together with six per cent interest from the date of the inventory, in the total sum of $19,657.64, less credits amounting to $696.92.

On December 5, 1925, upon petition of Nina I. Brown, the guardian ad litem in the present proceeding, John G. Price was appointed guardian of the estate of Frances Carlson, a minor then fifteen years old. Nina I. Brown was soon thereafter appointed guardian of the person of Frances Carlson. The bond of Price was fixed, and he thereafter filed a bond in the required amount, took the statutory oath, and proceeded in the execution of the trust. On February 1, 1930, upon petition therefor by Nina I. Brown, as guardian ad litem for Frances Carlson, pursuant to an order of the court, a citation was issued to Price by which he was required to appear on a day appointed, answer the petition, and show cause why a full account and report should not be filed forthwith. Price appeared in obedience to the citation, surrendered the assets of the guardianship estate in his possession into the custody of the clerk, and was given time to prepare his report.

Thereafter, on April 3, 1930, Price filed a report denominated "second report of guardian," praying that he be allowed to resign and that his report be approved. Exceptions were filed by the guardian ad litem to this report, among other things charging that Price was guilty of dereliction in his duties as guardian in dealing with himself and the corporation in which he was interested, concerning the estate of the ward, in continuing to hold investments of the ancestors under conditions that would result in loss, denying certain credits for disbursements claimed by the guardian, and alleging that the credits claimed were actually made out of a different trust. In effect, the

guardian ad litem prayed that practically the entire account should be disallowed.

Upon the issues thus raised, the matter was heard by the court without a jury, resulting in findings of fact, conclusions of law, and a decree, as above stated.

The guardianship accounts were intricate. The record is somewhat complicated, and only a brief outline of the more important facts will be made in the beginning, as it will be necessary to present others in discussing the contentions made by appellant.

It appears from the record that, for years prior to the inception of the guardianship and throughout its entire history from 1913 to December, 1929, Price was the principal stockholder and chief executive officer of Northern Bond and Mortgage Company, a corporation, engaged in the investment and mortgage business in Seattle. As it will be necessary to mention this company a great many times in this opinion, for brevity it will henceforth be referred to as Northern Bond.

Frances Carlson was the adopted daughter of Olaf Carlson and Isabella Carlson. The parents had for some years been clients of Northern Bond. They had accepted the judgment of Price in the matter of investments, and had invested substantial portions of their estate in what are known in the record as collateral trust bonds of Northern Bond. When Olaf Carlson died intestate, his estate was distributed one-half to the surviving wife, and one-half to Frances, the minor. Price was appointed the guardian of the estate of Frances and received the portion of the estate ordered distributed to her. It appears that a considerable portion of the assets thus received were the collateral trust bonds of Northern Bond. They were all set forth in the inventory of the guardian.

On May 29, 1928, the guardian filed a report of investments and reinvestments, which, aside from an

item of interest received, does not purport to cover the receipts and disbursements of the trust to that day. On May 29, 1928, upon due hearing, that report of investments and reinvestments was approved by the court and a disbursement ordered for the guardian and his attorney's fee. The court had previously, in 1926 and 1927, by order, authorized certain disbursements for traveling expenses of the minor and for the purchase of an automobile.

After the death of Olaf Carlson, Isabella Carlson died, leaving a will, which, among other things, provided:

"Frances Carlson, my adopted daughter, has received one-half of the estate of my deceased husband, Olaf Carlson, from which she will receive an income. It is my desire that Frances shall have an income of One Hundred Dollars ($100) per month as long as she is attending high school, and the sum of One Hundred and Twenty-five Dollars ($125) after leaving high school and until she arrives at the age of twenty-one (21) years or as long thereafter as she remains in attendance at a university or college. I direct that my trustee hereinafter named give to my said daughter, Frances Carlson, which, added to the income she receives from the estate of Olaf Carlson, deceased, will make the sums above named during the said period of time. After arriving at the age of twenty-one years, or thereafter upon leaving a university or college, then I direct that my trustee invest the income from my estate and the entire estate be retained by my said trustee until my said daughter Frances Carlson arrives at the age of thirty (30) years and be thereupon distributed to the said Frances Carlson and this trust thereafter terminated."

Price was nominated as executor of the will of Isabella Carlson and, under the above quoted provision, continued to act as testamentary trustee for the benefit of the minor Frances. There were thus created two distinct trusts in which Price is the trustee. He con-

24

tinued in both capacities up to the trial of this matter. The trusteeship involved about $19,000 of an estate and the guardianship an estate of about $15,000.

In his second report, the guardian claimed credits for disbursements of $5,805.98, substantially the whole of which was disallowed by the court. The largest part of this item is made up of monthly disbursements to the ward and the guardian of her person, for her maintenance and support. Under the provisions of the last will and testament of Isabella Carlson, fifty dollars a month was paid to Frances for her living and personal expenses, and seventy-five a month to Nina I. Brown, as guardian of her person, for her support and keep. Other credits or disbursements claimed by the guardian and disallowed by the court, were certain store accounts for clothing, doctor bills, safe deposit vault rental, automobile insurance, automobile repairs, automobile payments, university tuition, and compensation of the guardian previously allowed by the court.

The report of the guardian was prepared from an accountant's examination of the books. The bookkeepers or accountants of Northern Bond, who were at all times under the control and direction of Price, kept the books. Two different bookkeepers who had been in the employ of the Northern Bond testified for respondent. Identifying eighty-two items entered upon the books under the direction of appellant, only one item, a payment of fifteen dollars to another guardian ad litem, on November 3, 1928, was charged to the guardianship account. Every other item was charged to the trustee account; that is, the administrator's account.

Price, himself, testified that he had deputed the bookkeepers to make the bookkeeping entries against the proper funds. He also testified that he failed to give it the personal attention he presumed he should have

given it. He claimed that he had no personal knowledge of the entries of the items of account, but that they were made by the bookkeepers, who made them according to their own ideas of how they should be entered.

Northern Bond failed and became bankrupt in December, 1929. Its affairs had been large and active. Its office business was divided into a number of departments, such as mortgage, bookkeeping, cashier, operating, and the like. It was from the above mentioned bookkeeping entries that the trial court concluded that the $5,805.98 should be disallowed the guardian as a credit.

Respondent further charged the guardian with dereliction in his duties, in that he retained the investments of the ancestors, or reinvested in like securities, after he knew they had become insecure. The securities in question were the collateral trust bonds of Northern Bond. Some of these were purchased by Price himself and the balance he received as part of the original estate. These bonds were the general obligation of Northern Bond, as maker, and secured by the deposit of collateral with trustees. The collateral consisted of local improvement district bonds, real estate contracts, and mortgages. Second mortgages were used in part, and, generally, the security was of the junior grade.

From these, it appears that certain individuals acted as trustee of the collateral as well as a corporation known as Central Safe Deposit Co. In July, 1926, Northern Bond acquired control of Central Safe Deposit Co. and took possession of its vaults. The two companies were, thenceforth, conducted in the same location and by the same officers.

It appeared by the testimony of a witness, who had been an officer of both companies and an accountant,

that, shortly after the merger of the two companies, when there should have been outstanding collateral bonds aggregating $50,000, the collateral in the vaults amounted only to about $3,000. Thereafter, diligent search was made by agents of the trustees in bankruptcy for the $3,000 worth of collateral, and none had been found. Price stated that the collateral was intact long after the merger, and much of it should be available.

The original issue of Northern Bond collateral trust bonds aggregated $100,000. Over a series of years, they had been retired, unless renewed at the option of the investors owning the bonds, until there were only about $23,000 worth outstanding at the time of the trial. There had never been a default in principal or interest down to the time of the failure of the company.

The court charged the guardian with $6,950.00 in par value of bonds of Northern Bond which, with interest computed at six per cent from the date of the guardian's appointment, aggregated $8,825.34. All but four hundred fifty dollars in par value of these bonds was part of the original securities received by the guardian from the ancestors. Four hundred fifty dollars in par value had been purchased from Northern Bond during the guardianship.

Respondent further charged appellant with neglect in his duties in purchasing the bonds of Broadway Central Market and the Indianola Company. One thousand dollars par value of Broadway Central Market bonds, in his hands now, have no market value. It is contended that three thousand dollars par value of Indianola bonds are probably worth par. Price had instructed his assistants to keep the funds of the guardianship invested, and, as other investments matured, the Broadway Central Market bonds and Indianola

bonds were purchased. At the time, Price considered the investments safe and proper. Both issues were purchased at 90 and sold to the public at par. The guardian paid the same price as any other customer of the company. Neither he nor Northern Bond was interested in either of these companies, except as investors in the bonds. Both the Broadway Market bonds and the Indianola bonds were secured.

The fourth principal item charged against the guardian is the matter of the three real estate contracts that Price was unable to deposit in court at the time of the trial. These were denominated the Smith, the Arnsberg, and the Erskine contracts. They had been deposited to secure a collateral bond issue of Seattle Development Co., a further subsidiary of Northern Bond, with a trust company, and were discovered after the failure of Northern Bond. They had been purchased with funds of the guardianship. The trial court charged the guardian par and interest at six per cent per annum on all three contracts.

The eleven assignments of error made by appellant are argued in four groups.

Appellant first asserts that the effect of the decree of the court is to make the guardian an absolute insurer of the estate, liable for the full par value thereof with interest at the legal rate, and in making the appraised value of the original estate of $13,000 the basis thereof. It is insisted that the disbursements for maintenance of the ward in the sum of $5,805.98 were proper credits, which he should have been allowed. *In re Wilber,* 151 Wash. 525, 276 Pac. 876, and other cases and texts are cited to the effect that disbursements for the support, maintenance and education of the ward should be allowed as proper credits in the guardian's favor, regardless of any court order or presentment of vouchers.

28

The above authorities are not controlling in the present situation. The record is against appellant. He had in his hands two funds: One, the guardianship fund which is under investigation; the other, a trust fund created by the will of the mother of the minor, called, throughout the record and by appellant himself in his own transactions, the trust estate. He had authority to pay out money from either fund. The entries in the books incontrovertibly prove that expenditures were made from the trust fund and not from the guardianship fund. Nor can he say that the entries were not correctly made, since he was the only one legally responsible for the entries.

It is true, a guardian is not an insurer of the safety of the funds of his ward; but the courts require a more jealous guarding of the interests of such helpless persons than those of other beneficiaries of trusts.

This court long ago set its face against such indifference on the part of the guardian or shifting of duties to others. *In re Guardianship of Hill's Heirs,* 8 Wash. 330, 35 Pac. 1071. In that case, after referring to the complications involved in the estate in the two different trust funds, the court had occasion to say:

"This court . . . appreciates the annoyance, inconvenience and difficulties which necessarily beset the executors and the guardian in performing the duties which devolve upon them in the execution of their trust; but the very difficulties of the situation ought to prompt a strict compliance with the law in regard to the time and character of their reports to the court, and frequent, explicit and distinct accountings, so that the court, who ought always to jealously guard the interest of minor heirs, could see at a glance the condition of the estate, particularly so far as its relations with the guardian and executors are concerned."

It is to be noted that the court there set a precedent that, the burden being upon the guardian to satisfac-

torily account, he should take the necessary steps to keep proper accounts to prevent funds becoming commingled and confused, and, also, that the interest of the minor heirs should be jealously guarded by the court.

The duty of the guardian to account is specifically required by Rem. Comp. Stat., § 1575, but has always been required by the courts independently of statute. See, also, 26 R. C. L. 1387; II Perry on Trusts (7th ed.), § 821. If a guardian be trustee of two accounts, he has no right to commingle the assets, for they are independent, and he owes separate and several duties as to each. *In re Guardianship of Hill's Heirs, supra.* I Perry on Trusts (7th ed.), § 463.

■ It is further contended that the trial court erred in denying compensation for his services to the guardian. Where a guardian has been unfaithful in his trust, whether by willful act or indifference, it has been well established in this state that he is not entitled to compensation. *In re Haegele,* 150 Wash. 355, 272 Pac. 978; *In re Gardella,* 152 Wash. 250, 277 Pac. 846; *In re Rohne,* 157 Wash. 62, 288 Pac. 269.

■ It is insisted that the disallowance as credits of the collateral trust bonds aggregating $6,950 issued by Northern Bond, the Indianola Company bonds aggregating $3,000, and the Broadway Central Market bonds aggregating $1,000, which had been deposited by the guardian in the registry of the court with his report as the property of the guardianship estate, was error and should be reversed. The trial court disallowed these claims, but directed that, upon payment by the guardian of the amounts found due from him, he be permitted to withdraw the bonds from the registry of the court as his own property.

In connection with these, it is first contended by appellant that the purchase of these securities as an in-

vestment was approved by the court at the time of making his first report.

The guardian is required to make periodical reports, but there is no provision in the statute for their approval. Section 1575, *supra*, provides for a final account at the expiration of the trust.

There is nothing final about the interim account. At the termination of the trust, when a complete account must be made governing the entire proceedings of the trustee, all former accounts may be reconsidered, even though formerly approved by the court, and former allowances approved may be reduced or disallowed. *In re Rohne, supra*.

█ The second contention of appellant regarding these bonds is that, since the greater part of them came into his hands as a part of the trust estate, he is justified in holding them in the estate, and cannot be made answerable for their depreciation, even though that be complete. Texts and authorities are cited to sustain that contention.

"No duty is more clearly imposed by the very nature and purpose of a guardianship than to invest the ward's funds in such a manner as to produce an income, and unless the statute expressly requires it, the guardian can make such investments without an order of court. In some jurisdictions however, such order is required, and in others it is held that while such investments may be made without an order of the court, yet if so made the risk is with the guardian. In making investments the guardian must act in absolute good faith, and with reasonable diligence to insure the safety of the investment. The standard often applied in other relations, that one must act with such care as a reasonably prudent man would use in his own concerns, is hardly sufficient here. Even a prudent man may sometimes take a chance of loss for the sake of an unusual profit, or may loan money on insufficient security to oblige a friend. But in investing trust funds the element of speculation and that of favorit-

ism are alike forbidden. . . ." 12 R. C. L., p. 1131, § 29.

"This wise and salutary rule, designed to protect the weak and incompetent from the encroachments and overreachings of the artful and the powerful, is founded upon two principles. The one is, that the trustee has no right to derive any benefit or advantage from the trust fund; but all his skill and labor in the management of it must be directed to the advancement of the interest of his *cestui que trust*, and the other is that a trustee will not be permitted to create in himself an interest opposite to that of the party for whom he acts. . . . a trustee cannot as an agent of a third person purchase the trust property, for the obvious reason that if he did so he would undertake to discharge conflicting duties, and probably sacrifice the interests of one or the other of his principals." 26 R. C. L., p. 1326-7, § 189.

Although the greater part of the Northern Bond Company's collateral trust bonds came into the hands of the guardian as part of the Carlson estate, the guardian was not justified in retaining such bonds as investments, when good management of the trust fund required a change. The minor is helpless in the hands of the guardian of her estate. Moreover, great reliance had been placed in appellant as a shrewd and able financier by those who constituted him trustee of the two funds. He, alone, was well informed of the condition of the Northern Bond during his trusteeship. When he became aware that his securities were of doubtful value, or might soon become worthless, good faith toward his ward demanded that he change the investments. I Perry on Trusts (7th ed.), § 465.

Here, again, we early set the precedent in this state that, as a general rule, a person occupying a relation of trust or confidence to another is in equity bound to abstain from doing everything which can place him in a position inconsistent with the duty or

trust such relation imposes upon him, or which has a tendency to interfere with the discharge of such duty. Upon this principle, no one placed in a situation of trust or confidence in reference to the subject of a sale can be the purchaser, on his own account, of the property sold. If such a one purchases such property, it is the option of the person interested in the property to whom the relation of trust or confidence is sustained, to set aside the sale within a reasonable time, however innocent the purchaser may be. The right to set aside the sale does not depend upon its fairness or unfairness. *Dormitzer v. German Savings & Loan Society,* 23 Wash. 132 (l. c. 222), 62 Pac. 862. See, also, *Larrabee Co. v. Mayhew,* 135 Wash. 214, 237 Pac. 308; *In re Montgomery's Estate,* 140 Wash. 51, 248 Pac. 64.

Accordingly, we consider the foregoing contentions of appellant untenable.

As to the real estate contracts, it is manifest from the record that, by pledging the contracts belonging to the estate for the debts of Seattle Development Co., they were placed beyond the control of both the guardian and the estate. Hence, there is no error in charging the amount of the purchase price of all three contracts to the guardian with legal interest from the dates of purchase.

We have carefully examined the abstracts, exhibits, findings and conclusions in the record and can come to but one conclusion, and that is, that the judgment of the trial court was correct.

Affirmed.

TOLMAN, C. J., PARKER, MAIN, and MITCHELL, JJ., concur.