[Nos. 84379-1; 84746-1. En Banc.]
Argued June 30, 2011. Decided November 23, 2011.

*In the Matter of the Guardianship of* SANDRA LAMB.

*In the Matter of the Guardianship of* REBECCA ROBINS.

*In the Matter of the Guardianship of* MARY
JANE MCNAMARA.

*Michael L. Johnson* (of *Hardman & Johnson*), for appellants/petitioners.

*Robert M. McKenna, Attorney General,* and *Jonathon D. Bashford* and *William B. Work, Assistants,* for respondent.

*Sarah A. Dunne, Nancy Lynn Talner, Laura Jean Beveridge,* and *Alfred A. Day* on behalf of American Civil Liberties Union of Washington Foundation, amicus curiae.

*Emily Rebecca Cooper Pura* on behalf of Disability Rights Washington and National Disability Rights Network, amici curiae.

*Julian S. Wheeler,* amicus curiae.

¶1 WIGGINS, J. — James R. Hardman and his mother, Alice Hardman, certified professional guardians, are the court-appointed guardians of more than 20 Department of Social and Health Services (DSHS) clients residing at the Fircrest School, a residential habilitation center (RHC) in the city of Shoreline. The Hardmans are compensated from their wards' assets for providing services such as administering each ward's property interests and working with the ward's health care providers. The Hardmans also engage in extensive advocacy activities, lobbying officials at the local, state, and federal levels to keep Fircrest and other RHCs open and to oppose efforts to place Fircrest residents in community-based programs that the Hardmans believe provide inadequate care. In their triennial guardian reports, the Hardmans requested compensation for their advocacy activities. DSHS opposed the fee requests, arguing that the advocacy work was outside the scope of the guardians' duties. The Court of Appeals in *Lamb*[1] and the superior court in *McNamara*[2] denied the Hardmans' request for advocacy fees, finding that the advocacy work did not provide a direct benefit to the individual wards. We affirm.

## FACTS

### I. In re Guardianships of Lamb and Robins

¶2 Sandra Lamb was born July 19, 1956. Lamb has severe developmental disabilities. A guardian's report submitted by the Hardmans in April 2008 described Lamb's

---

[1] *In re Guardianship of Lamb*, 154 Wn. App. 536, 228 P.3d 32 (2009).

[2] *In re Guardianship of McNamara*, No. 06-4-02645-1 (King County Super. Ct., Wash. Dec. 18, 2009).

condition: "She is a person with multiple disabilities, including hemiplegia; hearing loss; seizure disorder; mild microcephaly; limited speech and articulation; and hyperactivity." *Lamb* Clerk's Papers (LCP) at 115. Lamb moved to Fircrest in 1964.[3] Rebecca Robins was born February 8, 1956. Robins also has severe developmental disabilities. The Hardmans' 2008 guardian's report for Robins described her condition: "She is a person with no speech, autism, microcephaly, scoliosis, affective disorder, anxiety/agitation, self-injurious behavior and aggression, and dysphagia. Rebecca is prone to anxiety and maladaptive behaviors." *Id.* at 26. Robins has resided at Fircrest since at least 1985.

¶3 In 2008, the Hardmans filed triennial guardian's reports for Lamb and for Robins, requesting approval of guardian fees for the prior three-year reporting period.[4] The Hardmans also requested a monthly allowance of $225 for guardian services in the upcoming three-year reporting period[5] and $150 per month for "special advocacy fees." *Id.* at 114. To support the request for advocacy fees, the Hardmans included an attachment, entitled "Advocacy Report of James R. Hardman," listing the Hardmans' advocacy activities from 2004 to 2006. *Id.* at 130. In the document, James Hardman claimed that "[t]he advocacy was and is for the purpose of exercising the resident's civil rights to participate in primarily political efforts to prevent the closure of their homes at Fircrest and to prevent their

---

[3] In 1982, Lamb moved to a community group home, but she returned to Fircrest due to "fits of anger and anti-social behavior." LCP at 98. A guardian ad litem report from 1986 notes that her physician recommended "against summer camp or community placement as Sandra does best in a highly structured setting." *Id.* In 2004, DSHS moved Lamb, over the Hardmans' objection, to Rainier School, another RHC. Lamb returned to Fircrest only after her guardians sued DSHS.

[4] Other than the ward's personal information, the reports are virtually identical. The parties' motions and arguments before the superior court and that court's orders are identical for each ward. The cases were consolidated in the Court of Appeals.

[5] In their response to DSHS's objection to the requested fees, the Hardmans increased their request for monthly guardian fees to $235 "for routine service hours." LCP at 169.

evictions and the ill effects of dislocation stress on their health and welfare." *Id.* at 130-31. The report lists the Hardmans' association with groups such as Friends of Fircrest, Fircrest Human Rights Committee, and Action for RHCs. The report describes extensive efforts to lobby legislators, the governor, the Shoreline City Council, and the Shoreline Chamber of Commerce. James Hardman also traveled to Washington, D.C., to attend a national conference and lobby the State's congressional delegation. The Hardmans lobbied officials to oppose legislation that would close Fircrest and land use decisions to sell or develop part of the Fircrest property. The Hardmans' efforts included producing a newsletter, a documentary and other materials, organizing tours of Fircrest, and engaging communications consultants who recommended creating a PowerPoint presentation. James Hardman also worked within the Washington State Disabilities Issues caucuses and as a delegate at the Washington State Democratic Convention.

¶4 The report claims Hardman devotes 80-100 hours per month on advocacy activities. To estimate fees, the report divides 80 hours per month by 28 wards currently or formerly residing at Fircrest and multiplies that number (2.85 hours per ward) by an hourly rate of $87.50. In total, the report estimates fees incurred equal $249.375 per ward per month, $100 more than what was preauthorized or sought in the triennial guardian's report.[6] LCP at 137. DSHS filed an objection to the Hardmans' requested guardian fees on June 2, 2008, arguing that WAC 388-79-030 limits routine guardian fees to $175 per month and that lobbying and community activism are not within the definition of "extraordinary fees" allowed in excess of the maximum. DSHS noted that RHC clients are required to contribute to their cost of care and that any increase in

---

[6] In his advocacy report, James Hardman also notes, "I have never collected compensation for all the clients. Some have died. Some have so little social security income that it will take years to be fully compensated, if at all." LCP at 137.

guardian fees, which are paid prior to a client's participation in cost of care, reduces the amount otherwise available to reimburse the State for care.

¶5 On June 6, 2008, the superior court commissioner approved the guardian reports for Lamb and Robins, awarding usual guardian fees of $175 per month and advocacy fees of $150 per month. The commissioner required the guardians to submit to the court, at the next date of accounting, a report specifically detailing the time spent on advocacy and relating the benefit conferred by that advocacy upon the ward in question. DSHS filed a motion to revise the commissioner's ruling, and Judge Steven Gonzalez of the King County Superior Court granted the motion on September 5, 2008. The court found that the "political and lobbying activities undertaken by [the Hardmans] are outside the scope of their guardianship" and denied extraordinary fees for those activities. *Id.* at 61. However, the court found that "[c]ommunity outreach activities that are necessary to protect the best interests of Ms. Lamb [and Ms. Robins] are within the scope of the guardianship." *Id.* The court found "that the fees for those activities currently amount to between $50 and $75 per month." *Id.* The court authorized $75 in extraordinary fees for community outreach and affirmed the commissioner's award of $175 for usual guardianship services.

¶6 Judge Gonzalez denied the Hardmans' motion for reconsideration, and the Hardmans appealed. DSHS cross appealed the part of the superior court's order allowing fees for community outreach. The Court of Appeals affirmed the superior court's order denying advocacy fees and reversed the order allowing fees for community outreach. *Lamb*, 154 Wn. App. at 546. The court held that the Hardmans had not shown that their advocacy activities directly benefited Lamb or Robins and that the superior court had not provided any rationale or factual basis for the award of community outreach fees. *Id.* The court also denied the Hardmans' attorney fee request. *Id.* at 549. We granted the

Hardmans' petition for review. *In re Guardianship of Lamb*, 169 Wn.2d 1010, 236 P.3d 895 (2010).

## II. In re Guardianship of McNamara

¶7 The facts of *McNamara* are similar to those in *Lamb*. The Hardmans seek approval of fees for advocacy activities on behalf of six Fircrest residents. All of the wards that are parties in *McNamara* have severe developmental disabilities. David Schmidt was 69 years old at the time this litigation started; he has resided at Fircrest since 1964. He has seizure disorders and atypical bipolar illness. Kirby Moser was 52 years old when the litigation started. He has cerebral palsy, spastic quadriplegia, limited vision, and dysphasia. Suzanne MacKenzie was 69 when the litigation began; she suffers from microencephaly, osteopenia, self-injurious behaviors, and motor seizures. She is nonverbal, blind, and nonambulatory. Richard Milton was 51 when the litigation began; he suffers from major motor seizures, cerebral palsy, spastic quadriplegia, and scoliosis. He is nonverbal and nonambulatory. Daniel Werlinger was 64 when this action began; he is nonverbal and suffers from quadriplegic rigidity and dysphagia. Finally, Mary Jane McNamara was 47 when the litigation began. She is nonverbal, nonambulatory, suffers hearing loss, and is tube-fed.

¶8 The guardian's report for each ward requests $400 per month for future guardian services, including advocacy activities. As in the reports for Lamb and for Robins, the Hardmans describe their involvement with groups that lobby to keep Fircrest School open. The report for McNamara states:

> Guardian devotes in excess of 20 hours per week in the activities described above. Political results are enhanced by leveraging groups with similar vision. Guardians can participate in the political process without aid from the groups described above but our effectiveness would be doubtful. With assistance from the allied groups we have defeated legislative attempts to close Fircrest.

*McNamara* Clerk's Papers (MCP) at 197. The report describes efforts to prevent land use decisions that would sell part of the Fircrest property, to oppose a plan to open a research lab on the property, and to bring to officials' attention the common interests of all RHC residents. The report also details the political and ideological conflict between advocates for state institutions such as Fircrest and proponents of community placement for the developmentally disabled, concluding, "The Guardians, using the best interests standard, are convinced that our clientele's best interests are clearly served by living and receiving services at Fircrest or Rainier, whichever they currently think of as home." *Id.* at 199.

¶9 While the guardians claim to devote 20 hours per month to their participation in advocacy groups, the guardian's report for McNamara later estimates that the guardians devote 5 hours per month per resident "[f]or all the foregoing activities," at an hourly rate of $112.50, totaling $562.50 per resident. *Id.* They request $400.00 per resident per month.[7] The report also requests $1,502.50 in attorney fees. DSHS filed an objection, arguing regulations limit routine guardianship fees to $175 per month and attorney fees to $600 for three years. DSHS also argued the advocacy activities described in the reports were outside the scope of the guardians' duties.

¶10 The superior court commissioner denied the fee requests in excess of the maximum set by regulation, concluding that the guardians had not shown that their general advocacy activities benefited the individual clients in question. The guardians moved for reconsideration, arguing that their advocacy conveyed a direct and substantial benefit by exercising the civil rights of their incapacitated wards. The guardians included hundreds of pages of docu-

---

[7] This figure represents "a low approximation of the benefits conferred on each resident." MCP at 199. The report provides only an approximation "because the reporting periods differ, the number of residents served change, and some residents die leaving no funds to compensate for these services." *Id.*

ments—including articles from magazines, law reviews, guardianship manuals, and declarations from fellow institutional care proponents—to support their motion. DSHS moved to strike the declarations and exhibits not considered previously by the commissioner. The guardians responded that the court should consider the materials because the Court of Appeals decision in *Lamb*, requiring a showing of "direct benefit," constituted surprise under CR 59. *Lamb*, 154 Wn. App. at 539. The commissioner granted the motion to strike, ruling the materials were untimely under CR 59(a)(4). The Hardmans moved to revise the commissioner's ruling, and Judge Michael Hayden of the King County Superior Court denied the motion and affirmed the commissioner's rulings in the consolidated cases on May 28, 2010.[8]

¶11 We granted the Hardmans' motion for direct review and consolidated *McNamara* with *Lamb* because the cases present the same central issue—namely, whether the Hardmans are entitled to compensation from their wards' assets for general advocacy activities. Additionally, we address whether RCW 11.96A.150 requires a court to award attorney fees to a guardian appealing a superior court order denying guardianship fees.

## ANALYSIS

¶12 The superior court in *Lamb* ruled as a matter of law that the Hardmans' political advocacy activities were outside the scope of their guardianships. We review ques-

---

[8] In their opening brief in *McNamara*, the Hardmans ask this court to vacate the superior court order striking materials submitted with the motion to reconsider the commissioner's ruling. To support their claim that the order to strike should be vacated, the Hardmans reference their response to the DSHS motion to strike and their motion to revise, both filed in superior court. They make no other arguments. DSHS correctly notes that Washington courts have consistently held that a party waives issues not fully argued in appeals briefs, rejecting attempts by litigants to incorporate by reference arguments contained only in trial court briefs. *See, e.g.*, *US W. Commc'ns, Inc. v. Utils. & Transp. Comm'n*, 134 Wn.2d 74, 111-12, 949 P.2d 1337 (1997). The Hardmans have waived this issue.

tions of law de novo. *City of Aberdeen v. Regan*, 170 Wn.2d 103, 107, 239 P.3d 1102 (2010). When a superior court applies guardianship law to a particular case and orders a fee allowance, we review the superior court's order for an abuse of discretion. *In re Guardianship of Spiecker*, 69 Wn.2d 32, 34-35, 416 P.2d 465 (1966). We also review an award of attorney fees under RCW 11.96A.150 for abuse of discretion. *In re Estate of Black*, 153 Wn.2d 152, 173, 102 P.3d 796 (2004). Issues of statutory interpretation are reviewed de novo. *Rozner v. City of Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991).

I. Guardianships in Washington

¶13 "Although governed by statute, guardianships are equitable creations of the courts and it is the court that retains ultimate responsibility for protecting the ward's person and estate." *In re Guardianship of Hallauer*, 44 Wn. App. 795, 797, 723 P.2d 1161 (1986). In Washington, a court's authority to impose a guardianship has been codified since the 19th century. The Code of 1881 gave probate courts[9] the "power to appoint guardians to take the care, custody and management" of incapacitated persons and "of their estates, real and personal." CODE OF 1881, ch. CX, § 1631. Early case law resolving guardianship issues generally conflates guardian of the person and guardian of the person's estate, and unsound business decisions could be evidence of a person's mental incompetency. *In re Guardianship of Bayer's Estate*, 101 Wash. 694, 698, 172 P. 842 (1918). Courts have long been concerned with preserving the ward's estate from undue influence, fraud, and the ward's own " 'folly.' " *Id.* at 695 (quoting 22 CYC. 1139). However, where a guardianship appointment would only result in waste of the ward's estate, courts have found the appointment unnecessary. *Reed v. Brown*, 36 Wash. 130, 134, 78 P. 783 (1904).

---

[9] By 1893, the power to appoint a guardianship rested with the superior courts. HILL'S GEN. STAT. CODE OF PROC. ch. XV, § 1154; *In re Guardianship of Wetmore*, 6 Wash. 271, 273, 33 P. 615 (1893).

¶14 Today, guardians are called upon to manage wards' property interests, but also to make vital decisions regarding medical care and end-of-life preferences. *In re Guardianship of Hamlin*, 102 Wn.2d 810, 815, 689 P.2d 1372 (1984). While early guardianships generally involved family members as guardians, nonrelative certified professional guardians may now be appointed to perform these duties. As of 2009, there were 237 certified professional guardians in Washington. CERTIFIED PROF'L GUARDIAN BD., 2009 ANNUAL REPORT 4, *available at* http://www.courts.wa.gov/content/publicUpload/cpg/2009%20Annual%20Report.pdf. Out of the approximately 20,000 guardianship cases in Washington, courts appointed certified professional guardians (or certified professional guardian agencies) in approximately 3,400 cases. *Id.* The Certified Professional Guardian Board, established by this court, regulates professional guardians' certification, education, and discipline and issues standards of practice to which all certified professional guardians are held. These standards direct guardians to provide timely and accurate reports to the court, act within the scope of the appointed guardianship, consult with the incapacitated person and defer to that person's autonomous decision-making capacity when possible, cooperate with professional caregivers and relatives of the incapacitated person, and seek independent professional evaluations and opinions when necessary to identify the incapacitated person's best interests. STANDARDS OF PRACTICE REGULATION § 401, *available at* www.courts.wa.gov/committee/?fa=committee.child&child_id=30&committee_id=117.

II. Guardianship fees under Washington's Medicaid scheme

¶15 RCW 11.92.180, the statute that allows "just and reasonable" guardianship fees, incorporates the State's Medicaid payment scheme:

> Where the incapacitated person is a department of social and health services client residing in a nursing facility or in a residential or home setting and is required by the department

of social and health services to contribute a portion of their income towards the cost of residential or supportive services then the department shall be entitled to notice of proceedings as described in RCW 11.92.150. The amount of guardianship fees and additional compensation for administrative costs shall not exceed the amount allowed by the department of social and health services by rule.

Thus, a discussion of the statutory scheme is warranted.

¶16 The incapacitated individuals at the center of this case reside at Fircrest School, one of five RHCs permanently established by statute to serve persons with developmental disabilities.[10] Former RCW 71A.20.010 (1988), .020 (1994). Fircrest residents are liable for their "costs of care, support and treatment." RCW 43.20B.415. Congress provides federal funds to the states to provide medical services for needy citizens through Medicaid. 42 U.S.C. § 1396. Washington's participation in Medicaid is voluntary, but once a state elects to participate, it must comply with Medicaid laws and regulations. *Multicare Med. Ctr. v. State*, 768 F. Supp. 1349, 1357 (W.D. Wash. 1991). Under federal regulations, the Medicaid program will not reimburse a state for an institutionalized Medicaid patient's care to the extent that the patient can contribute to the cost of his or her care. A patient must contribute all of his or her postdeductible income,[11] minus certain deductions, toward

---

[10] In the past three decades, the number of RHC residents has decreased due to trends favoring community-based care. *Parsons v. Dep't of Soc. & Health Servs.*, 129 Wn. App. 293, 296, 118 P.3d 930 (2005). Indeed, federal law requires states to place disabled persons in community settings whenever medically appropriate, as long as the person does not object to being placed outside a state institution and a community placement can be reasonably accommodated. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601-02, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999). DSHS has the authority to downsize an RHC population in anticipation that the legislature will eventually close some facilities. *Parsons*, 129 Wn. App. at 297-98.

[11] "Income is anything an individual receives in cash or in-kind that can be used to meet his/her needs for food, clothing, or shelter. Income can be earned or unearned." WAC 388-475-0600(1). The patients in this case receive income from federal Social Security Disability Insurance, a railroad retirement pension, and the Veterans Benefits Administration. All of these benefits are considered available income for purposes of determining participation in cost of care.

cost of care in a Medicaid program. 42 C.F.R. §§ 435.725, 435.733, 435.832. For every dollar allowed as a deduction, the state or federal Medicaid program must contribute funds to cover the patient's institutionalized medical needs. In Washington, the monthly amount paid by institutionalized Medicaid patients toward their cost of care is generally referred to as "participation" in cost of care. WAC 388-79--020.

¶17 Under federal regulations, guardianship fees are not deducted from a patient's income prior to calculating the patient's participation in cost of care. *See, e.g.,* 42 C.F.R. §§ 435.725, 435.733. However, under Washington's Medicaid plan, court-ordered guardian fees may be deducted from a patient's income prior to determining participation in cost of care. WAC 388-513-1380(4)(d).

¶18 "Guardianship fees" are "necessary fees charged by a guardian for services rendered on behalf of a client." WAC 388-79-020. The legislature has directed DSHS to limit guardianship fees.[12] RCW 43.20B.460. Under state regulation, usual guardian fees that may be compensated from a

---

[12] In a letter dated March 23, 1993, from Thomas G. Wallner, the Medicaid regional administrator, to Secretary Jean Soliz of DSHS, the federal agency in charge of administering Medicaid, warned DSHS:

> It has come to our attention that the State of Washington is still allowing a deduction from income for court ordered guardianship fees when determining the amount certain Medicaid recipients are required to contribute towards the costs of their care. This practice violates the provisions of Washington's Medicaid State Plan and results in excessive Medicaid payments being made on behalf of the affected recipients.

LCP at 164. In 1994, DSHS requested the Washington Legislature pass Senate Bill 6604, the bill that became RCW 43.20B.460. S.B. REP. on S.B. 6604, at 1, 53d Leg., Reg. Sess. (Wash. 1994). The bill report for Senate Bill 6604 explains the background of the proposed legislation:

> The fees charged by private guardians to state-supported nursing home residents have increased substantially in recent years. In 1989, such fees totaled $125,000. By 1993, this had grown to $1.6 million, or an average of $274 per month for each of the 486 Medicaid nursing home residents known to have had a fee-charging guardian last year.
> When private guardianship fees are increased, state costs also grow, because state-assisted residents have less disposable income available to contribute to the cost of their care. The state has also been notified by the federal government that it is out of compliance with federal Medicaid requirements

patient's assets prior to participation in cost of care cannot exceed $175 per month. WAC 388-79-030(1). "The usual and customary guardianship services" for which this maximum "must be deemed adequate" include managing the client's financial and property affairs, making health care decisions, visiting the client, communicating with the client's service providers, and preparing reports for the court. WAC 388-79-050(4)(b)(ii).

¶19 A guardian may request additional fees for providing "[e]xtraordinary services," including time spent on: "[u]nusually complicated property transactions"; "[s]ubstantial interactions with adult protective services or criminal justice agencies"; "[e]xtensive medical services setup needs and/or emergency hospitalizations"; and "[l]itigation other than litigating an award of guardianship fees or costs." WAC 388-79-050(4)(b)(iii). "In considering a request for extraordinary fees or costs, the department must consider . . . [t]he department's obligation under federal and state law to ensure that federal medicaid funding is not jeopardized by noncompliance with federal regulations limiting deductions from the client's participation amount." WAC 388-79-050(4)(b)(i).

¶20 While the examples of "extraordinary services" provided in the regulation are not exhaustive, each refers to a specific, time-limited issue—a property transaction, interaction with criminal justice agencies, extensive medical services or emergency hospitalization, or litigation. In contrast, the Hardmans seek compensation for ongoing advocacy activities that have lasted many years and have no end in sight. Moreover, the examples listed in WAC 388-79--050(4)(b)(iii) directly relate to the usual guardianship services compensable under WAC 388-79-050(4)(b)(ii). A guardian's normal fee covers typical property dealings on

because it does not have specific standards defining which guardianship charges will be recognized as reasonable and which will not.

*Id.* Senate Bill 6604, directing DSHS to limit guardian fees by rule, passed and took effect on June 9, 1994. Laws of 1994, ch. 68, § 2.

behalf of the ward and normal interactions with the ward's health care providers, but where the property dealing is unusually complicated or where the ward experiences a new medical condition that requires extensive interaction with health care providers, the guardian may be eligible for extra compensation. The Hardmans' extensive advocacy efforts do not directly relate to their usual guardianship duties such as handling their wards' property interests and discussing care plans with their wards' health care providers.

¶21 More fundamentally, fees for guardians are limited to "necessary fees charged by a guardian for services rendered on behalf of a client." WAC 388-79-020. The Hardmans have not shown that their advocacy fees are necessary to render guardian services. The Hardmans' requested advocacy fees simply do not fit within the limited definition of "fees" that can be charged to Medicaid clients such as Lamb, Robins, and McNamara.

III. The superior courts' denial of fees for general advocacy activities

¶22 We review the superior courts' orders denying the Hardmans' advocacy fee requests for abuse of discretion under existing guardianship statutes and case law. A court abuses its discretion "when its decision or order is manifestly unreasonable, exercised on untenable grounds, or exercised for untenable reasons." *Noble v. Safe Harbor Family Pres. Trust*, 167 Wn.2d 11, 17, 216 P.3d 1007 (2009). "A decision is based 'on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

¶23 The Hardmans argue that a "direct benefit" rule applied by the Court of Appeals in *Lamb* and the superior court in *McNamara* is applicable only to cases involving the guardianship of a ward's estate, which can be measured by

an increase or decrease in value, rather than the ward's person. The Hardmans claim they are entitled to compensation for their advocacy activities because their advocacy was for each ward's "best interest." DSHS concedes that Washington case law has previously not required a "direct benefit," but the agency notes that the rule is implied by long-standing case law holding that a guardian may be compensated only for activities that are necessary and beneficial to the guardianship.

¶24 The Hardmans are professional guardians. *See* RCW 11.88.008 (defining "professional guardian"). They remain at all times "under the general direction and control of the court making the [guardianship] appointment." RCW 11.92.010. "The court having jurisdiction of a guardianship matter is said to be the superior guardian of the ward, while the person appointed guardian is deemed to be an officer of the court." *Seattle-First Nat'l Bank v. Brommers*, 89 Wn.2d 190, 200, 570 P.2d 1035 (1977). Chapter 11.92 RCW provides the powers and duties of professional guardians. The guardian's duties include the responsibility "to care for and maintain the incapacitated person in the setting least restrictive to the incapacitated person's freedom and appropriate to the incapacitated person's personal care needs, [and to] assert the incapacitated person's rights and best interests." RCW 11.92.043(4).

¶25 The majority of cases addressing guardianship compensation concern guardianships of incapacitated persons' estates, where the purpose of the guardianship is "to preserve and conserve the ward's property for his own use, as distinguished from the benefit of others." *In re Guardianship of Michelson*, 8 Wn.2d 327, 335, 111 P.2d 1011 (1941). However, the statute establishing the "just and reasonable" rule for guardianship compensation, RCW 11.92.180, does not distinguish between guardians of the person and guardians of the estate, and the fact that a guardian's service to the estate is more easily measured (by the estate's increase or decrease in value) than the guard-

ian's service to the person does not render general guardianship compensation rules inapplicable. Moreover, the Hardmans are the guardians of both the person and estate of each of their wards. They have the duty to preserve their wards' assets for their wards' use. In this case, the wards use their property to participate in cost of care.

¶26 While the issue of allowing compensation for advocacy fees is a matter of first impression for this court, guardianship case law provides some applicable rules. First, guardians must work for the individualized best interests of each ward. The guardian of an incapacitated person becomes the surrogate decision maker for the ward, ensuring that any medical decisions concerning the ward's care remain "individualized." *Hamlin*, 102 Wn.2d at 820. When acting in the ward's best interest,[13] a guardian must make decisions "on a case-by-case basis with *particularized consideration of the best interests and rights of the specific individual." Id.* at 815.

¶27 Second, courts allow guardianship fees only when the guardian's work provides a benefit to the guardianship. A court may not award guardianship fees simply on the basis of work performed. *In re Guardianship of McKean*, 136 Wn. App. 906, 918, 151 P.3d 223 (2007). Instead, the court must determine the need for the work performed and whether the work benefited the guardianship, though the guardian need not succeed in every legal battle to show a benefit. *Id.* at 918-19. It has long been the rule that "[a] guardian cannot be allowed to make a profit from the

---

[13] The guardian's opinion as to the ward's best interest is not dispositive—where there is a conflict between the guardian and a physician, hospital, or prognosis committee, the superior court must resolve the conflict. *Hamlin*, 102 Wn.2d at 820-21; *see also In re Guardianship of Ingram*, 102 Wn.2d 827, 842, 689 P.2d 1363 (1984) ("[T]he court need not place on any party any particular burden of proof or persuasion, nor give any presumption of validity to the petition of the guardian or guardian ad litem."). Thus, while the guardian has the authority to "assert the incapacitated person's rights and best interests," RCW 11.92.043(4), it remains at all times the responsibility of the court to make the decision as to the ward's best interest. *Ingram*, 102 Wn.2d at 842. The goal of a guardianship is to do what the ward would do, if the ward were competent to make the decision in question. *Id.* at 838.

handling of his ward's estate. His compensation must be such a sum as the court deems proper in view of the value of the services performed." *In re Estate of Montgomery,* 140 Wash. 51, 53, 248 P. 64 (1926).

¶28 Third, a court may allow guardianship fees only where there is evidence in the record to justify compensation from the ward's estate. *Disque v. McCann,* 58 Wn.2d 65, 70-71, 360 P.2d 583 (1961). This court has noted that "concerning the responsibilities of a guardian, '. . . the courts require a *more jealous guarding of the interests of such helpless persons* than those of other beneficiaries of trusts.' " *Id.* at 67 (alteration in original) (quoting *In re Guardianship of Carlson,* 162 Wash. 20, 28, 297 P. 764 (1931)). Contrasting guardianship compensation from a general action for damages where a court "may find any amount within the range of the testimony," a guardian may be compensated only for "expenditures actually made on behalf of the ward." *Id.* at 71. "It is the duty of the trial court in such a case to include in its findings the specific amounts it finds to have been so expended so that they can be challenged on appeal." *Id.*

¶29 Applying these rules to the present case, we hold that the superior courts did not abuse their discretion in denying the Hardmans' request for fees for general advocacy activities. First, the Hardmans have not shown that they acted in the individualized best interest of each ward. Other than the Hardmans' preference for institutionalized care, there is no evidence in the record that every one of their wards would be best served by remaining at Fircrest. Yet the Hardmans calculated their fee requests for Lamb and for Robins on the premise that their advocacy in favor of RHC care was done on behalf of all 28 of their wards currently residing at Fircrest. LCP at 137. Similarly, there is no basis to believe that each of the Hardmans' wards would be best served by preventing the sale or development of some Fircrest property. Certainly some ambulatory wards might be impacted by increased traffic around Fircrest, but

other wards would benefit from the additional funds that would make modernization of the facility possible. Guardians must make decisions "on a case-by-case basis with *particularized consideration*" of the incapacitated individual's best interest, *Hamlin*, 102 Wn.2d at 815, but the Hardmans have not shown that they engaged in advocacy on the basis of the individual needs of each ward.

¶30 Second, the Hardmans are not entitled to compensation simply on the basis of the time they spent on advocacy activities. The Hardmans have made advocating for institutional care their primary occupation, but they are entitled to compensation only if the work was necessary and provided a benefit to the guardianships. *McKean*, 136 Wn. App. at 918. A guardian is entitled to compensation only for "expenditures actually made on behalf of the ward." *Disque*, 58 Wn.2d at 71. The record reflects that the Hardmans have requested fees not only for time spent serving the wards at issue in these cases, but their requests also indicate that they seek to be made whole for previous work done on behalf of other wards. LCP at 137 (James Hardman states, "I have never collected compensation for all the clients. Some have died. Some have so little social security income that it will take years to be fully compensated."); MCP at 199 (explaining that the fee request is an approximation "because . . . the number of residents served change, and some residents die leaving no funds to compensate for these services").

¶31 Further, the Hardmans' record keeping does not support their fee requests. In the guardian's reports for Lamb and for Robins, the Hardmans claim they spend 80-100 hours per month on advocacy activities on behalf of all their Fircrest clients. Their hourly rate for these activities is $87.50. In the *McNamara* record, the Hardmans claim they spend 20 hours per month participating in their advocacy groups; later, they estimate they spend 5 hours per resident on advocacy activities. In the McNamara guardian's report, they charge an hourly rate of $112.50. *Id.*

Though they appear to provide the same services to all of their wards at Fircrest—indeed, their fee requests for Lamb and for Robins depend on dividing their time commitment by the total number of their Fircrest wards—there is no explanation for the discrepancies in time and hourly rate. The superior courts did not abuse their discretion in denying compensation from individual wards' assets to support the Hardmans' full-time advocacy occupation.

¶32 Finally, a court with guardianship jurisdiction must support its order allowing fees with findings of the specific guardianship expenditures that are being compensated. *Disque*, 58 Wn.2d at 71. Here, the superior court in *Lamb* allowed the Hardmans $75 per month per ward for "[c]ommunity outreach activities that are necessary to protect" the ward's interest, but the court failed to define those activities or distinguish them from advocacy activities for which the guardians could not be compensated. LCP at 61-62. The court also failed to give any factual basis for the $75 monthly allowance. We affirm the Court of Appeals holding that the superior court in *Lamb* abused its discretion in allowing a monthly allowance for "community outreach."

IV. Compensation for exercising an incapacitated person's right to petition

¶33 The legislature has expressly declared that it is the State's obligation to aid developmentally disabled persons' enjoyment of "all rights and privileges under the Constitution and laws of the United States and the state of Washington." RCW 71A.10.015. "The existence of developmental disabilities does not affect the civil rights of the person with the developmental disability except as otherwise provided by law." RCW 71A.10.030(1). Before the Court of Appeals, the Hardmans argued that the denial of advocacy fees constituted a denial of their wards' right to petition under article I, section 4 of the Washington State Constitution and right to free speech under the First

Amendment to the United States Constitution. Amicus American Civil Liberties Union of Washington (ACLU) claims that through the guardianship system, Washington has provided for the exercise of incapacitated persons' civil rights.

¶34 We have stated, "A judicial finding of incompetency does not deprive the ward of [the] right to choose or refuse treatment. The finding of incompetency . . . means that the ward's rights will be exercised by the guardian on the ward's behalf." *In re Guardianship of Ingram*, 102 Wn.2d 827, 836, 689 P.2d 1363 (1984) (citation omitted). Amicus ACLU relies on the second sentence in that statement, without reference to the first sentence, to claim that the guardian of an incapacitated person may exercise the person's constitutional rights. But the second sentence cannot be read in isolation. *Ingram* was one of a line of cases this court decided to determine incapacitated persons' right to refuse life-preserving treatment. *See Hamlin*, 102 Wn.2d at 815 (holding that a guardian's authority includes the power to consent to withdrawal of life support); *In re Welfare of Colyer*, 99 Wn.2d 114, 128, 660 P.2d 738 (1983) (holding that a guardian may use his or her best judgment and exercise the ward's right to refuse treatment). These cases do not stand for the proposition that a guardian exercises all of his or her ward's constitutional rights.[14]

¶35 In fact, certain rights of the ward are *not* exercisable by a guardian. A guardian does not have the authority to execute or amend a will on behalf of an incapacitated person. RCW 11.12.010; *see also Toler v. Murray*, 886 So. 2d 76, 78-79 (Ala. 2004) (excluding the power to make a will from the scope of a guardian's statutory authority). A guardian does not have the authority to exercise a ward's right to marry. *See In re Estate of Gallagher*, 35 Wn.2d 512, 518-20, 213 P.2d 621 (1950). Most significantly in this case

---

[14] Moreover, the right to refuse treatment, exercised by the guardians in those cases, is not solely constitutional; it is partly derived from statute. RCW 11.92.043(5) (providing guardians with the authority to exercise informed consent on behalf of their wards).

where the guardians purport to give effect to each ward's political voice, a guardian cannot exercise a ward's right to vote, as the Hardmans concede.

¶36 To counter the argument that allowing guardians to exercise their wards' constitutional rights to petition would write a "blank check" for any advocacy activities purportedly done on a ward's behalf, the Hardmans and ACLU claim that judicial review of fee requests would limit compensable advocacy activities to those activities that are in the ward's best interest.[15] But this would put courts in the untenable position of determining that some speech done in the ward's name was worthy of compensation and other speech was not, requiring courts to make value judgments of the content of the guardians' speech activities. As this case demonstrates, where the guardians have an ideological preference that counters DSHS and legislative policy, requiring courts to evaluate the content of political speech would require courts to take sides in policy-making debates.

¶37 Finally, declining to compensate the Hardmans for their general advocacy activities will not silence advocates working on behalf of persons with developmental disabilities. The federal Developmental Disabilities Assistance and Bill of Rights Act requires states to establish a system "to protect and advocate the rights of individuals with developmental disabilities." 42 U.S.C. § 15043(a)(1). Disability Rights Washington (DRW) is the designated advocacy group in this state with the authority to "pursue legal, administrative, and other appropriate remedies . . . to ensure the

---

[15] The Hardmans proposed an additional limitation on their political advocacy in their motion for reconsideration of the commissioner's ruling in *McNamara*, stating, "The limitation on advocacy is a practical one—the amount of money available limits the Guardians' advocacy. The social security benefit or other cash benefit [is] the only funds available to the Incapacitated Person to advocate his or her civil rights." MCP at 330. Thus, the Hardmans indicate that their advocacy is limited only by the amount of their wards' assets. But this is an artificial limitation—competent people in charge of their own affairs and finances frequently make decisions about how to spend their money, but they generally do not expend the sum of their assets on lobbying.

protection of, and advocacy for, the rights" of persons with developmental disabilities "who are being considered for a change in living arrangements." 42 U.S.C. § 15043(a)(2)(A)(i). The statute also authorizes DRW to educate policy makers on behalf of incapacitated persons. 42 U.S.C. § 15043(a)(2)(L).

¶38 Pursuant to federal law, DRW is independent of DSHS, and DRW has the authority to bring a suit against DSHS on behalf of persons with developmental disabilities. 42 U.S.C. §§ 15043(a)(2)(G), 15044(b). While we understand the Hardmans' view that DRW has, in this instance, taken a position the Hardmans believe is not in their wards' best interest, the fact remains that a process for giving voice to incapacitated persons exists. Further, guardians of incapacitated persons are eligible to serve on the governing board of DRW. 42 U.S.C. § 15044(a)(1)(B)(ii). The Hardmans may continue to advocate on behalf of their developmentally disabled wards, but when they are exercising their own political voice and where their services do not serve a particular ward's individualized needs, they are not entitled to compensation from that ward's assets.

V. Attorney fees under RCW 11.96A.150

¶39 RCW 11.96A.150 governs attorney fee awards for disputes involving guardians. RCW 11.96A.150(2). The statute provides:

> Either the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings; (b) from the assets of the state or trust involved in the proceedings; or (c) from any nonprobate asset that is to be the subject of the proceedings. The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable. In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.

RCW 11.96A.150(1). The Court of Appeals declined to award the Hardmans their fees below, citing "the unique issues in this case." *Lamb*, 154 Wn. App. at 549. The Court of Appeals also denied the Hardmans' request for attorney fees on appeal because the Hardmans did not prevail on appeal. *Id.*

¶40 The express language of RCW 11.96A.150 leaves attorney fee awards in cases resolving guardianship disputes to the court's discretion. The statute allows a court considering a fee award to consider any relevant factor, including whether a case presents novel or unique issues. *In re Estate of D'Agosto*, 134 Wn. App. 390, 402, 139 P.3d 1125 (2006); *In re Estate of Burks*, 124 Wn. App. 327, 333, 100 P.3d 328 (2004). We affirm the Court of Appeals denial of the Hardmans' attorney fee request under RCW 11.96A-.150. Additionally, we deny the Hardmans' attorney fee request for their appeal to this court because they are not the prevailing party and because the litigation has not benefited the guardianship estates.

## CONCLUSION

¶41 The Hardmans are not entitled to compensation from their individual ward's assets for their extensive general advocacy activities that are neither individualized to serve a particular ward's best interests nor necessary to perform their guardianship duties. We affirm the Court of Appeals in *Lamb* and the superior court in *McNamara*.

MADSEN, C.J., and C. JOHNSON, ALEXANDER, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.

Reconsideration denied January 27, 2012.