COURT OF APPEALS DIV 1
2013 APR 22 AM 8: 55



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) |
| | ) No. 67856-6-I |
| Respondent, | ) |
| | ) DIVISION ONE |
| v. | ) |
| | ) |
| MARK LYMAN HOUGHTON, | ) UNPUBLISHED OPINION |
| | ) |
| Appellant. | ) FILED: April 22, 2013 |
| | ) |

LEACH, C.J. — Mark Houghton appeals his convictions for first degree arson and filing a false insurance claim. He contends that a fire investigator failed to honor his request for counsel during an interview, that the prosecution improperly commented on his right to remain silent, and that the deputy prosecutor committed reversible misconduct. But the evidence at the suppression hearing supports the trial court's conclusion that Houghton knowingly and voluntarily waived his Fifth Amendment right to counsel. The trial court's curative instruction obviated any potential prejudice resulting from the improper references to Houghton's exercise of his constitutional rights, and Houghton's failure to object precludes review of the alleged misconduct. We also reject Houghton's challenge to the restitution order and the claims he raises in a statement of additional grounds for review. We therefore affirm.

## FACTS

Following an investigation into a suspicious boat fire, the State charged Mark Lyman Houghton with first degree arson and filing a false insurance claim. At trial, Charles Leahey testified that he and his family went for a stroll at the Dockton Marine Park on Vashon Island during the late afternoon of Christmas Day 2009. As the Leaheys walked down the ramp from the fixed pier to the floating dock, they passed a large yellow sailboat. Charles heard faint music and "rummaging kind of sounds" inside the boat. Other than this sailboat, only a few small boats were at the marina, and the Leaheys did not see anyone else on the dock.

A short time later, Charles's wife, Amy, noticed a large cloud of smoke rising from the sailboat. Charles immediately ran back toward the boat while he dialed 911. Amy called Charles's attention to a man, later identified as Mark Houghton, who was walking away up on the fixed pier.

Charles yelled at the man several times before he stopped and turned around. Charles determined that the sailboat belonged to Houghton and informed him it was on fire. Houghton "kind of slumped" and walked slowly back. Houghton resisted Charles's suggestions to try to extinguish any remaining fire.

Meanwhile, the 911 operator asked Charles for the street address of the marina. Houghton agreed to walk up to the marina office on the shore where he could place a 911 call from a land line. According to Charles, Houghton proceeded toward the office at "the same incredibly slow pace."

Houghton approached the first fire fighter to arrive on the scene, Brett Kranjcevich, and identified his boat as the one with the fire. Houghton explained that he worked as a general caretaker at the marina. The two walked to the boat, where Kranjcevich observed smoke still escaping from inside. Houghton said that he had had problems in the past with juveniles committing vandalism. Kranjcevich testified that in his 30 years of experience, he had never seen anyone as calm as Houghton "when their primary residence was on fire."

When fire fighter Chris Huffman arrived a short time later, Houghton told him that juveniles might have started the fire in retaliation for a prior incident. Houghton denied the presence of any gasoline on the boat. When fire fighters entered the boat, they were able to put out the small, smoldering fire with an extinguisher.

Inside the cabin, fire fighters detected the odor of gasoline and found some canvas sailcloth, sail bags, and cushions that had burned or melted. They

also found two punctured gasoline containers. One of the containers had the name "Lyman" on it.

A nearby cardboard box contained several burned candles that appeared to have acted as a delayed ignition device. Someone had pared down the candles with a knife. Fire investigator Barry Pomeroy explained that shaving the sides of the candles would cause them to start dripping hot wax onto the surrounding materials within about 10 to 15 minutes. The spreading hot wax, in turn, would likely create a larger flame. But the initial combustion had apparently consumed all of the available oxygen in the space, extinguishing the fire before it could ignite any pooled gasoline.

Houghton testified that at the time of the fire, he was living on the sailboat and working as a volunteer dock host for King County in exchange for moorage. Houghton had contracted with Dave Parker to purchase the boat for $15,000. Over a period of 18 months, Houghton made six monthly payments and still owed nearly $14,000. Houghton also owed nearly $200,000 for back child support and student loans.

As part of the contract with Parker, Houghton purchased insurance from State Farm that covered only the boat. In November 2009, Houghton filed a claim with State Farm for various items stolen from the boat. When State Farm

denied the claim for personal items, Houghton added personal property coverage to the policy. The added coverage went into effect on December 22, 2009.

After the fire, Houghton filed a claim with State Farm for various personal items destroyed in the fire, including bags of groceries, Christmas presents, and a computer. Fire investigators did not see these items in the boat after the fire.

Houghton told Heidi Hellbaum, a State Farm investigator, that his ex-wife, people involved with drugs, or vandals had started the fire. Houghton failed to appear multiple times for a scheduled deposition, and State Farm eventually denied his claim.

At trial, Houghton testified that he was moving things in and out of the boat on the afternoon of December 25, 2009, getting ready to take a ferry to visit his family for the holiday. While inside a storage area near the boat, Houghton heard a loud "bang," which he described as the "distinctive noise . . . of the teak boards clacking down together." He then looked outside and saw a "guy jetting down the dock." Houghton chased the man, who had a spider-web tattoo on his neck, for a short distance and unsuccessfully attempted to take his picture. Houghton stopped when he saw a gun tucked into the man's back pocket. The man then ran off the dock and disappeared. Houghton turned and started walking back towards the boat, where he encountered the Leaheys.

Houghton acknowledged that until trial, he had not told anyone about the man with the spider-web tattoo. He explained that he did not trust the police, fire investigators, or insurance agents and that he wanted to wait and "see that they were investigating seriously" before disclosing the information. Houghton claimed that he had "reported a lot of people for dealing drugs" and feared that the man with the tattoo was part of a retaliation effort.

The jury found Houghton guilty as charged, and the court imposed a standard range sentence.

## ANALYSIS

### Waiver of Right to Counsel

Houghton contends that the trial court violated his Fifth Amendment right to counsel when it admitted his recorded statement to Barry Pomeroy, a fire investigator for the King County Sheriff's Office. After arriving at the marina on the evening of the fire, Pomeroy spoke briefly with fire fighters and then asked Houghton if he would give a recorded statement. Houghton agreed, and the two went to the marina office at about 7:00 p.m.

At the beginning of the interview, Pomeroy advised Houghton of his Miranda[1] rights. Pomeroy explained that it was the fire investigation unit's

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

practice to provide Miranda warnings before speaking to "any primary person involved in a fire, either the victim or any associated witnesses that are primarily involved in the incident." After acknowledging that he understood each of the enumerated rights, Houghton said,

HOUGHTON: OK. M-, I wonder if I should just call my lawyer or not. Should I call a lawyer? Huh-ha!

POMEROY: For, for a victim statement?

HOUGHTON: Huh, yeah, I, ok-, it's a vic-, that's what this is a victim statement—?

POMEROY: Yeah.

HOUGHTON: OK, sure.

Houghton moved to suppress the recorded statement, arguing that Pomeroy had ignored his unequivocal request for an attorney and had mischaracterized the interview as a "victim statement." Following a hearing, the trial court denied the motion to suppress, concluding that Houghton's waiver of his Miranda rights was knowing, voluntary, and intelligent.[2] We review the trial court's decision after a CrR 3.5 hearing to determine whether substantial

---

[2] The trial court also denied Houghton's motion to suppress a second statement that he gave to Pomeroy on the night of the fire and his statement to fire investigators after his arrest. On appeal, Houghton does not challenge the admission of the two later statements.

evidence supports the findings of fact and whether those findings support the conclusions of law.[3]

Houghton contends that Pomeroy failed to honor his request for counsel and tricked him into waiving his Fifth Amendment right to counsel. The State maintains that Miranda warnings were not required because Houghton was not in custody during the initial interview with Pomeroy.[4]

The trial court's ruling on this issue is not completely clear. During its oral ruling, the trial court found no evidence that Houghton was in custody during the interview. But in its written CrR 3.5 findings and conclusions, the court determined that "Miranda was applicable." For purposes of appeal, we will therefore assume that Houghton was in custody during his interview with Pomeroy. The State bears the burden of demonstrating a knowing, voluntary, and intelligent waiver of Miranda rights.[5]

In order to invoke the right to counsel under Miranda, a suspect "must unambiguously request counsel" during the custodial interrogation.[6] Here,

---

[3] State v. Broadaway, 133 Wn.2d 118, 130-31, 942 P.2d 363 (1997).

[4] Miranda, 384 U.S. at 467 (procedural protections apply when suspect is subject to "custodial interrogation").

[5] State v. Athan, 160 Wn.2d 354, 380, 158 P.3d 27 (2007).

[6] Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); see also State v. Radcliffe, 164 Wn.2d 900, 907, 194 P.3d 250 (2008).

Houghton "wondered" whether he should call a lawyer and then asked Pomeroy, "Should I call a lawyer?" The question was clearly equivocal and insufficient to invoke the right to counsel under Miranda.[7] Contrary to Houghton's suggestion, an interviewer is not required to clarify a suspect's equivocal statement regarding counsel.[8]

Houghton also claims that Pomeroy deceived him into waiving his right to counsel by mischaracterizing the interview as a "victim statement" and suggesting that he would be admitting guilt if he asked for an attorney. But Pomeroy had essentially just arrived at the marina when he first interviewed Houghton and knew only that the fire was suspicious. He had not yet examined Houghton's boat, and there was no evidence that he had already concluded a crime had occurred or that Houghton was a suspect. Under the circumstances, nothing in the record suggests that Pomeroy's characterization of the interview as a "victim statement" was inaccurate, misleading, or coercive. Moreover, after being advised of his rights, Houghton reiterated that he wanted to tell Pomeroy what had happened and acknowledged that he received no threats or promises.

---

[7] See Davis, 512 U.S. at 455 ("Maybe I should talk to a lawyer" is equivocal request for an attorney); Radcliffe, 164 Wn.2d at 907 ("[M]aybe [I] should contact an attorney" is an equivocal request for an attorney).

[8] Davis, 512 U.S. at 461.

The record amply supports the trial court's conclusion that Houghton knowingly, voluntarily, and intelligently waived his Miranda rights, including his right to counsel.

## Comment on Failure To Testify

Houghton contends that the deputy prosecutor committed reversible error by commenting on his failure to testify at the suppression hearing. Several times during cross-examination, the deputy prosecutor asked Houghton about the fact that he did not testify at the suppression hearing. The trial court overruled the defense objections but eventually directed the deputy prosecutor to "[m]ove on."

At the beginning of the lunch break, the trial court indicated that it now considered the references to Houghton's failure to testify to be "questionable." The court directed counsel to address the propriety of a curative instruction when they returned from lunch. After the lunch break, the deputy prosecutor acknowledged that a curative instruction was probably the "safest approach," and defense counsel "agree[d] with that plan." The court then instructed the jury:

> Members of the jury, first, I'm going to strike some testimony from this morning. There was some testimony about—during the cross-examination, questions asked by Mr. Hamilton to Mr. Houghton about a pretrial hearing that was held in this case about the admissibility of the statement given to Inspector Pomeroy by Mr. Houghton. That testimony is stricken. So you may not discuss during your deliberations that pretrial hearing, the fact of the pretrial hearing and what choice, if any, Mr. Houghton made during the

-10-

pretrial hearing to testify or not testify. Is everyone clear on that ruling?

Defense counsel did not object to the text of the instruction.

Houghton contends that the corrective instruction was deficient because the court "did not tell the jury it could not use the testimony for any purpose." But the instruction clearly identified the improper testimony, informed the jury that it was stricken, and directed the jury not to discuss either the existence of the pretrial hearing or Houghton's decision whether to testify at the hearing. Viewed in context, the instruction clearly informed the jury that it could not consider the stricken testimony for any purpose. Moreover, jury instruction 1 reinforced the court's admonition by directing the jury "not to consider [evidence stricken from the record] in reaching your verdict." Nothing in the record overcomes the presumption that the jury followed these instructions.[9]

Prosecutorial Misconduct

Houghton contends that the deputy prosecutor committed reversible misconduct on two occasions during trial. A defendant claiming prosecutorial misconduct bears the burden of establishing that the challenged conduct was both improper and prejudicial.[10] Where, as here, the defendant fails to object, we

---

[9] See State v. Johnson, 124 Wn.2d 57, 77, 873 P.2d 514 (1994).
[10] State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).

will not review the alleged error unless the defendant demonstrates the misconduct was "so flagrant and ill intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct."[11]

During cross-examination, the deputy prosecutor asked Joe Van Hollebeke, a King County Parks employee, whether he "trust[ed]" Houghton's word after working with Houghton at the marina for about a year. Van Hollebeke replied, "Not entirely." The deputy prosecutor referred briefly to the comment during closing argument. Houghton argues that the deputy prosecutor improperly elicited the witness's opinion of his credibility.[12]

At the conclusion of closing argument, the deputy prosecutor offered the jury an "old quote":

> Before justice can exist in the conduct and conscience of a government, it must first reside in the hearts and souls of the citizens. And that's you as you deliberate on this case asking for a verdict that is just, and a verdict that is honest. And I ask you to find him guilty for his deeds.

Houghton argues that the comments mischaracterized the role of the jury and undermined the presumption of innocence.[13]

---

[11] State v. Belgarde, 110 Wn.2d 504, 507, 755 P.2d 174 (1988).

[12] See State v. Boehning, 127 Wn. App. 511, 525, 111 P.3d 899 (2005) (flagrant misconduct to ask one witness whether another witness is lying).

[13] See State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012) (the jury's job is to determine whether State proved the charged offense beyond a reasonable doubt, not to "speak the truth" or "declare the truth").

Van Hollebeke's statement about "trust" was not a direct comment on the credibility of Houghton's trial testimony but rather a reference to the period when he worked with Houghton at the marina. The deputy prosecutor's closing remarks, viewed in context, did not undermine his earlier comments or the jury instructions, which clearly and accurately set forth the State's burden of proof.

Moreover, the challenged conduct did not involve the type of inflammatory or emotional appeal that results in incurable prejudice.[14] The statements were brief and isolated in the context of the entire trial and did not form part of an overarching theme. Consequently, to the extent that the questioning and comments were improper, a prompt objection and curative instruction would have negated any potential prejudice.[15] Houghton's claim of prosecutorial misconduct therefore fails, and "our analysis need go no further."[16]

Restitution

For the first time on appeal, Houghton challenges the inclusion of certain items in the restitution order. In particular, he contends that the record fails to demonstrate a causal connection between his crimes and legal fees incurred by county fire fighters and certain investigation costs incurred by State Farm.

---

[14] See Emery, 174 Wn.2d at 763.
[15] Emery, 174 Wn.2d at 764.
[16] Emery, 174 Wn.2d at 764.

Houghton maintains that the matter must therefore be remanded for a restitution hearing. We review the amount of a restitution order for an abuse of discretion.[17]

"If the defendant disputes facts relevant to determining restitution, the State must prove the damages at an evidentiary hearing by a preponderance of the evidence."[18] But no hearing is required if the defendant acknowledges or agrees to the amount.[19] A failure to object to restitution constitutes an acknowledgement or agreement to the amount.[20]

When the parties appeared for sentencing, both the deputy prosecutor and defense counsel had already signed the order setting restitution. Although defense counsel noted "as to form" next to his signature, he raised no objection to restitution or to any aspect of the restitution order. The failure to object deprived the sentencing court of any opportunity to correct errors and to create a record that would permit meaningful appellate review.[21] Under the circumstances, we agree with the State that Houghton's failure to raise either a

---

[17] State v. Griffith, 164 Wn.2d 960, 965, 195 P.3d 506 (2008).
[18] State v. Kinneman, 155 Wn.2d 272, 285, 119 P.3d 350 (2005).
[19] State v. Pockert, 53 Wn. App. 491, 498, 768 P.2d 504 (1989).
[20] State v. Ryan, 78 Wn. App. 758, 762, 899 P.2d 825 (1995).
[21] See State v. Moen, 129 Wn.2d 535, 547, 919 P.2d 69 (1996).

general objection to restitution or a specific objection to the items now challenged precludes appellate review.[22]

Statement of Additional Grounds for Review

In his statement of additional grounds for review, Houghton alleges the following errors: (1) the trial court erred in refusing the defense's request for a continuance on August 4, 2011; (2) the trial court erred in denying his request for new counsel on August 19, 2011; (3) the deputy prosecutor and the police conspired to conceal the fact that the State's witnesses "were obviously paid to testify against me"; (4) the State withheld exculpatory and impeaching evidence and committed other acts of misconduct; (5) the trial court's imposition of restitution and legal financial obligations was arbitrary and unfair; (6) the State conspired with the insurance company investigator to conceal the fact that the boat suffered minimal damage; (7) the evidence of damage to the boat was tainted by a defective chain of custody; (8) the State committed misconduct by submitting a prejudicial psychological evaluation at sentencing; (9) an unreported sidebar would demonstrate prosecutorial misconduct; (10) the insurance

---

[22] See Ryan, 78 Wn. App. at 763 (restitution amounts not objected to are deemed acknowledged); State v. Harrington, 56 Wn. App. 176, 181, 782 P.2d 1101 (1989) (failure to raise challenge to amount of restitution precludes appellate review); see also State v. Branch, 129 Wn.2d 635, 651, 919 P.2d 1228 (1996).

company investigator committed perjury; (11) the police and insurance company investigator failed to follow up on information about possible other suspects; (13) the State violated the prohibition against double jeopardy by jailing him multiple times before trial; (14) the police arrested him without probable cause, failed to advise him of his Miranda rights, and tricked him into taking a polygraph test; and (15) defense counsel's performance was constitutionally deficient.

All of Houghton's contentions rest on alleged evidence that is not part of the designated appellate record. We therefore cannot consider his claims on direct appeal.[23] Houghton's attempts to incorporate materials and arguments that he has apparently raised in a pending personal restraint petition also fail. A party on appeal may not incorporate by reference arguments presented in other

---

[23] State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

No. 67856-6-I/17

proceedings.[24]     Under the circumstances, Houghton's claim that the accumulation of errors violated his right to a fair trial also fails.[25]

Affirmed.

_Leach C.J_

WE CONCUR:

_Schindler, J_          _Cox, J_

---

[24] See In re Guardianship of Lamb, 173 Wn.2d 173, 183 n.8, 265 P.3d 876 (2011) (party waives issues not fully argued in appeal briefs).
[25] In re Det. of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012).

-17-