# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Estate of: <br><br> MARK L. BESOLA, <br><br> Deceased. | No. 56775-0-II <br><br> UNPUBLISHED OPINION |

VELJACIC, J. — Julia Besola-Robinson appeals the trial court's order awarding her $20,000 in attorney fees, which was a reduction from her request of $513,231.70 in attorney fees and $3,826 in costs. Julia argues that the trial court erred in failing to compensate her for fees and costs incurred in the will contest litigation underlying this appeal on the incorrect reasoning that she was not required to participate in the will contest. We affirm.

## FACTS

This case involves the central question of whether the trial court abused its discretion in its award of attorney fees to Julia.[1] To better understand the extent of Julia's litigation conduct, a thorough discussion of related facts is necessary.

I.     FACTUAL BACKGROUND

Following Mark Besola's death in January 2019, the trial court appointed Mark's sister Amelia Besola as personal representative of Mark's $5 million estate. Four months later, Eric Pula, one of Mark's housemates, and Robyn Peterson, an acquaintance of Mark's, filed a will

---

[1] After a first reference, we use the first names of the members of the Besola and Besola-Robinson families for clarity in this opinion. No disrespect is intended.

purportedly signed by Mark in December 2018 (December 2018 Will). The December 2018 Will expressly disinherited Amelia and named Mark's other sister, Julia, as a beneficiary. In the ensuing two years, Amelia and Julia, fought to invalidate the December 2018 Will; Amelia as a will contestant and Julia as both a beneficiary of the December 2018 Will and respondent to the will contest.

Mark, Julia, and Amelia were close for most of their lives, however, they had a strained relationship at the time of Mark's death. The three siblings were partners in Besola Realty Enterprises.[2] The partnership owned a number of real estate properties in Washington. In the partnership, Mark and Amelia co-owned properties, and Julia shared an interest in properties co-owned by all three siblings.

A.      Mark's Lake Tapps Home

Mark resided in a home on Lake Tapps and permitted various people to live in the home. Mark's housemates depended on him for their housing and financial needs. Since 2015, Kelly McGraw, had rented a mother-in-law unit at the home. In 2018, Brandon Gunwall, James Garrett, and Eric Pula moved into the home. Garrett was a renter at the property. Pula provided care for Mark in exchange for room and board. Gunwall did odd jobs at the residence, including

---

[2] Julia includes additional facts regarding Besola Realty Enterprises, asserting that the other respondents "involved Julia's interest in Besola Realty Enterprises in the litigation." Br. of Appellant at 19. The facts show that Julia's interest in Besola Realty Enterprises was raised during Julia's deposition and referenced in Pula's answer to the will contest. The record supports that the siblings had a dispute with regard to the partnership at the time of Mark's death. Support for Julia's assertions that she was deposed twice specifically regarding her partnership interest and that she battled claims regarding the partnership in competing motions for summary judgment, are not found at the citations she provides. We are not required to search the record for applicable portions thereof in support of Julia's arguments. *Mills v. Park*, 67 Wn.2d 717, 721, 409 P.2d 646 (1966). As addressed briefly in the analysis section the involvement of Besola Realty Enterprises does not provide support for reversing the trial court's order.

landscaping, cleaning cars, and caring for Mark as well as Mark's dogs. In 2018 through early 2019, residents of the home had access to Mark's electronic devices and financial information.

### B. Attack at Lake Tapps Home and Mark's Death

On December 1, 2018, two men entered Mark's Lake Tapps home with a baseball bat and attacked Mark and other residents. Pula shot and killed one of the intruders and wounded the other. Mark suffered a medical emergency. On December 30, 2018, Gunwall transported Mark to Auburn Medical Center. Mark remained at the hospital until his death on January 1, 2019. Mark's housemates, including Pula, Gunwall, and McGraw, continued to occupy Mark's home for a period of time following his death.

### C. Amelia Appointed Personal Representative

After Mark's death, the trial court appointed Amelia as personal representative of Mark's estate.[3] Pursuant to the court order appointing Amelia as personal representative, Amelia had limited powers that permitted her "to ascertain the assets of the Estate and to report said assets to the Court." Clerk's Papers (CP) at 642. During her time as personal representative, Amelia transferred 13 shares of Phoenix Central Laboratory for Veterinarians, Inc. (Phoenix) stock belonging to the Estate to Julia. The value of the shares at the time of Mark's death totaled $221,000.

---

[3] The January 3, 2019 order naming Amelia as personal representative states that Mark died intestate. At the time of his death, however, Mark had a prior will, which he executed in 2013 in which he left "all [his] tangible personal property, other than property held or used for investment for the production of income, or for use in any trade, profession, or business, to my sister, AMELIA M. BESOLA, in the event she shall survive me." CP at 1723. Julia stood to inherit nothing under the 2013 will.

In January and February 2019, Amelia sought access to the Lake Tapps house to gather financial information and records for Mark's estate. None of the residents of the home informed Amelia that they had seen Mark create a will.

On or about April 4, 2019, Amelia served the residents of the Lake Tapps home with eviction notices. On April 9, 2019, the trial court issued an order to show cause why the Lake Tapps house should not be delivered to Amelia. Pula and McGraw were present when the court issued its order to show cause.

D.      Probate of the December 2018 Will

On May 8, 2019, after speaking with Garrett by telephone, Pula and Peterson filed the December 2018 Will. The December 2018 Will gave Pula 55 percent of Mark's estate, McGraw 25 percent of the estate, and two charities 10 percent each. The December 2018 Will also named Gunwall as the caretaker for Mark's six dogs. In exchange for taking care of the dogs, Gunwall would receive a life insurance policy for the care and support of Mark's animals. The December 2018 Will expressly disinherited Amelia. Julia received Mark's interest in two real properties. The December 2018 Will named Pula as executor and McGraw as alternate executor. The December 2018 Will contained a no contest provision, which stated that if any beneficiary contested the validity of the Will, the beneficiary's inheritance would be revoked and annulled.

On September 16, 2019, Gunwall petitioned for the admission of the December 2018 Will to probate. That same month, the trial court admitted the Will to probate. The superior court revoked Amelia's letters testamentary and granted letters testamentary to Pula.

II.   LITIGATION

A.   Amelia and Julia Seek Removal of Pula

Following the revocation of letters testamentary, Amelia sought Pula's removal as personal representative. Amelia's attempts to have Pula removed were unsuccessful. In November 2019, Julia objected to the grant of letters testamentary to Pula. Julia also moved the court to deny Pula's motion to post alternate security when he was unable to post the required bond to serve as personal representative. The trial court permitted Pula to post alternate security and serve as personal representative.

B.   Will Contest Litigation

In October 2019, Amelia filed a Trust and Estate Dispute Resolution Act (TEDRA) petition contesting the December 2018 Will, and a separate action regarding Mark's non-probate assets.[4] The respondents to the TEDRA petition included all the beneficiaries under the December 2018 Will. Julia filed an answer to the will contest petition and requested that the trial court grant all relief sought by Amelia. From October 2019 to February 2022, Amelia and Julia litigated to obtain the invalidation of the December 2018 Will. The will contest litigation included frequent motion filings, hearings, and oral arguments.

McGraw, individually, Pula, individually, and the Estate filed cross-claims against Julia in their answers to the TEDRA petition. The Estate argued that Julia violated the no-contest provision in the December 2018 Will when she sought Pula's removal as personal representative. The Estate sought declaratory relief, stating that Julia violated the no-contest provision as well as revocation

---

[4] The action regarding the non-probate assets was initiated under separate cause number 19-4-01945-2, and later consolidated with the will contest under number, 19-4-01902-9.

of her beneficiary designation. The Estate also filed a second cross-claim, arguing that Julia was unjustly enriched when she received the 13 shares of Phoenix stock.

On September 15, 2020, the Estate filed a motion to recover the Phoenix shares that Amelia transferred to Julia and for the transfer of stock to be declared void. The Estate asked the court to require Julia to return the 13 shares and take all steps necessary to permit issuance of the shares back to the Estate. Julia filed a response and moved to strike the motion. Amelia also filed a response to the Estate's motion, asking that the motion be denied. On September 25, 2020, the court entered an order in which it found that the transfer of the 13 shares from Amelia to Julia was void because Amelia lacked authority to make the transfer. The court ordered Julia to return the shares to Phoenix Veterinary Laboratories in order to permit Phoenix Veterinary Laboratories to pay all proceeds from the shares into a blocked account belonging to the Estate. The trial court did not enter an order regarding the Estate's claim that Julia was unjustly enriched by the transfer of the stock.

Additional litigation followed concerning the Phoenix shares. In October 2020, the Estate filed a motion, stating that although Julia had returned the Phoenix Laboratories stock, because of a merger, Phoenix Laboratories no longer existed and the share proceeds remained under Julia's name in a third-party escrow, Computershare. The Estate asked the court to require Julia to execute the required documents to return the funds to the Estate. Julia responded to the motion contending that she had completed her obligation to return the stock and had agreed to execute further documentation as required, however, the parties could not agree on a number of disputed issues. In December 2020, the trial court entered an additional order requiring Julia to take the necessary steps to have the funds from the shares returned to the Estate.

In December 2020, Pula was removed as personal representative after he stole more than $185,000 from the Estate. Pula stole the funds after the funds were placed in an unblocked account, contrary to a court order. On December 22, Julia, as estate beneficiary and respondent, filed a motion to disqualify the firm representing Pula from representing the new personal representative, Michael Smith, and for the disqualification of Smith. Amelia responded to the motion, requesting that the court grant Julia's motion to disqualify. At the hearing on the motion, both Julia's and Amelia's attorneys argued in favor of the motion. The trial court granted the motion to disqualify.

During the more than two years of litigation following the filing of Amelia's petition, Amelia's counsel, including at least four attorneys, and Julia's attorney worked closely. On November 1, 2019, Amelia and Julia entered a joint defense agreement. Amelia paid attorney fees on behalf of Julia to Julia's attorney, including as much as 90 to 95 percent of the fees. Counsel for Amelia wrote in a November 1, 2019 e-mail to other members of Amelia's team that they could have Julia's attorney issue deposition notices to Pula and Gunwall stating, "[t]his would give us a free look at the witnesses while keeping [the opponent's firm] and Stu's power dry for the Will contest litigation." CP at 1904. Another e-mail to Julia's attorney, evidences Amelia's approach to litigation. Amelia's counsel wrote, ""in the larger sense, the depositions are about litigation tempo and the opposing counsels' resource burn rate. We need to tie up their time so they can't make money on their other cases." CP at 429. In a judgment and order regarding attorney fees to one of the beneficiaries, McGraw, the trial court concluded that Amelia had engaged in "scorched earth" litigation tactics, which "made it even more costly to litigate this matter." CP at 4396.

III.    The TRIAL

On February 22, 2021, trial began on the will contest. Julia filed a witness and exhibit list, and trial brief regarding the two cross-claims and she also appeared at trial represented by counsel.

A notice of trial attendance also required Julia to testify as a witness for the Estate. At the conclusion of trial, the trial court ruled that the December 2018 Will was valid.

In early March 2021, shortly after trial, evidence surfaced that an account had been created on the legal forms website FormSwift.com. FormSwift provides legal document templates that customers can customize. The account was created using Peterson's credit card and e-mail on April 19, 2019, several months after Mark's death, during the eviction proceedings at the Lake Tapps house. The website disclosed that in April 2019, a document titled "Last Will and Testament of Mark Lester Besola" was created.

Because of the new evidence, the trial court declined to enter its findings of fact and conclusions of law. The trial court agreed to permit additional discovery regarding the FormSwift account and entered an order reopening the trial. During this time, Julia's counsel's time records show active efforts to obtain additional discovery, including preparation for depositions of the proponents of the December 2018 Will and FormSwift representatives, attempts to serve subpoenas for depositions, and preparations for trial. During this time counsel also attended a hearing and presented argument against the Estate's motion for attorney fees and costs.

IV. The COURT'S RULING

Trial was again held in November 2021. During the trial, counsel for Julia participated in the questioning of McGraw and Pula. The evidence regarding the FormSwift account revealed that the April 2019 will that was created on Peterson's account bore a striking resemblance to the December 2018 Will. After trial, the trial court held that the December 2018 Will was fraudulent.

The trial court's entered findings including the following:

> 55. The December 2018 Will could not have been signed by Mark Besola because it was created more than four months after Mark Besola died and backdated.

8

56. The December 2018 Will and its Beneficiary Schedule is not a valid testamentary document.

57. Robyn Peterson (possibly with the aid of others) created the April 2019 Will and the December 2018 Will.

58. Eric Pula, James Garrett, and Robyn Peterson who created, signed, or filed the December 2018 Will knew it was a false, simulated document and created, signed, or filed the December 2018 Will with an intention to deceive.

. . . .

61. The December 2018 Will did in fact deceive this Court as evidenced by the Order admitting it to probate.

62. The December 2018 Will harmed the true beneficiaries of the estate of Mark Besola as well as the innocent beneficiaries of the December 2018 Will.

CP at 6287-88.

The trial court vacated the order admitting the December 2018 Will to probate.

## V.    AWARD OF ATTORNEY FEES

On November 09, 2021, Julia and Amelia filed their respective motions for attorney fees. In Julia's motion, she argued that her "support of the Will Contest petition has benefitted her brother Mark's estate through the discovery and establishment at trial that the disputed December 6, 2018 Will was a phony." CP at 6218. Julia argued that since objecting to Pula as personal representative and contesting the December 2018 Will, "[s]he was forced to defend multiple court hearings, go through a fruitless mediation, and provide discovery documents." CP at 6222. She contended that communication and cooperation on litigation strategy between Amelia's counsel and her own "saved money and time. . . . Further there are no cost requests for duplicative costs, such as hiring duplicate experts to establish case evidence or review expert opinions." CP at 6485-86. Julia emphasized that "[h]er legal interests were . . . unique to her" as she "received *no legal benefit from the successful Will challenge*." CP at 6486 (emphasis added).

In support of the award for attorney fees and costs, Julia's attorney submitted a declaration requesting fees for 1,085.42 hours spent representing Julia, which totaled $513,231.70 in attorney

9

fees and $3,826.00 in costs. Along with the declaration, counsel submitted contemporaneous time records for the fees and costs incurred in the case.

The trial court granted Julia's motion for attorney fees and costs, stating that an award was equitable and appropriate under RCW 11.24.050 and RCW 11.96A.150. The trial court's order stated that Julia should prepare a declaration describing her fees and costs for presentation at a subsequent hearing.

At the hearing on Julia's request for fees, the trial court inquired whether Julia's attorney had received payment.

> THE COURT: Have you been paid, [Julia's attorney]?
> [JULIA'S ATTORNEY]: Yes, I have been paid.
> THE COURT: Who paid you?
> [JULIA'S ATTORNEY]: I received payment through Julia and through Amelia.
> THE COURT: So who paid you most [sic] the money?
> [JULIA'S ATTORNEY]: Sitting here today, I can't tell you who paid me most of the money.
> THE COURT: Do you know whether or not Julia got the money from Amelia?
> [JULIA'S ATTORNEY]: I do not.
> THE COURT: Because it was represented to me early, early on, a couple years ago, that Amelia was paying for your services for Julia.
> [JULIA'S ATTORNEY]: She certainly did pay for some of our bills. That's absolutely true.

Report of Proceedings (RP) (Feb. 4, 2022) at 13-14. The trial court asked expressly, if Julia stood to get anything if the December 2018 Will was invalidated.

> [C]orrect me about this because it will be coming up here in a minute when we talk about his fees. But as I understand [counsel's] client, Julia Besola, stood to get some real property up in the San Juan Islands under the fraudulent will and stands to get nothing under the new 2012 will; is that correct?

RP (Feb. 4, 2022) at 11. Julia's attorney responded, "Yes, that is correct, Your Honor." RP (Feb. 4, 2022) at 11.

10

The trial court stated:

> If her sister had won, she gets nothing. If her sister had lost, she gets this land. So why was she interested? Because she was effectively on the side trying to set this will aside. Why did she spend a half a million dollars to prove that she didn't have any interest in this property at all?

RP (Feb. 4, 2022) at 14-15. The trial court noted that Julia was not actually contesting the December 2018 Will, "as you pointed out several times during all of this. She was not the petitioner. So why did she spend any kind of money at all on this?" RP (Feb. 4, 2022) at 14. Julia responded that she was a named party to the litigation, and she also was required to litigate with regard to the gift of Phoenix stock that she had received.

The trial court observed that the litigation concerning the stock "was an infinitesimal part of this litigation." RP (Feb. 4, 2022) at 16. Julia responded that the litigation concerning the stock was significant as it required multiple hearings, and took months of work to resolve the issue. She acknowledged however, "it wasn't an issue that we dealt with during the course of the trial because it was resolved by your orders prior to the trial." RP (Feb. 4, 2022) at 16. Julia argued that while she did not actually contest the December 2018 Will, she "very clearly took the position that she did not believe this was her brother's will." RP (Feb. 4, 2022) at 16. Julia informed the court that she incurred ten percent of her fees participating in the trial. She added:

> the remainder of that time was in responding to Eric Pula, as the personal representative of the estate, discovery requests, two depositions, another set of discovery requests, hearings to get his lawyers disqualified, which Julia Besola-Robinson led the charge on, which was successful, and then multiple other discovery matters leading through and after the trial.

RP (Feb. 4, 2022) at 17.

The trial court remained unconvinced that Julia should receive her requested award of attorney fees, stating:

11

[Julia] didn't have to spend a half a million dollars. I mean, I just find this grossly unreasonable. And the fact of the matter is, a big chunk of this money was paid by Amelia. So who were you really representing? I mean the argument from the Pula side was always you're just another voice for Amelia Besola.

And, frankly, you were. You were an intelligent voice. You had lots of really good things to add to this, and in some ways I'm glad you were here, but it wasn't necessary. It just wasn't necessary. Your client stood to only lose by that success, and that's what happened. She lost her interest in that property in the San Juan Islands that she would have got under the fraudulent will. That's why I don't see why she would go and spend half a million dollars doing this. She could have been a witness that said all the same things she actually said and spent less than a tenth of this kind of money.

RP (Feb. 4, 2022) at 18-19. The trial court decided to award Julia $20,000.

Here's what I'm going to do. I'm going to award $20,000. I think what's reasonable here. That's what was reasonable in terms of monitoring this. [Julia's attorney] was effectively representing Amelia, and he didn't necessarily add much to that part of the conversation.

To represent Julia in this thing was a fairly minimal task. If Amelia was successful, and she was spending money hand over fist to try to get that money, then the concerns that she wanted vindicated of having her brother's true intentions being identified would have been vindicated, and she didn't have to spend any money doing it.

Certainly, it was being vigorously prosecuted by Amelia. Too vigorously, actually. The intensity of the litigation was over the top. To the extent she needed to monitor this, fair enough. To the extent she wanted a lawyer present for her deposition and so on or at trial, that's fine too. But if what she was interested in was in having Mark's true interest as represented in the 2012 will vindicated, then all she had to do was let Amelia succeed, and she assisted with that, but she didn't need to spend a half million dollars doing it. If Amelia had not been successful, she would have actually been ahead because she would have gotten the San Juan Islands property.

So, I don't understand why you spend half a million dollars to avoid getting property up in the San Juan Islands, but that's what she did here, and that's because this was really Amelia Besola's lawyers' fees. That's what really was happening here, and Amelia can't dip into this will anymore[sic] than she already is, which is over $700,000 already.

So 20,000 bucks. That's it. That's all that's reasonable.

RP (Feb. 4, 2022) at 22-23.

On February 24, 2022, the trial court entered its order requiring Pula to pay Julia $20,000.

The trial court entered the following findings of fact:

12

1. It was reasonable for Julia Besola-Robinson to be represented by counsel during her depositions and during the trial itself, but she was not required to materially participate in the Will contest litigation and could have sat on the sidelines while Amelia Besola pursued the litigation;

2. Julia Besola-Robinson did not contest the fraudulent Will

3. Julia Besola-Robinson received no benefit from participating in the Will contest because the result is that she now inherits nothing under the 2013 Last Will and Testament now being probated.

4. Julia Besola-Robinson's attorneys really worked on behalf of Amelia Besola and Amelia Besola has already been given her own award for her attorney's fees and costs incurred.

CP at 6497.

The trial court awarded Amelia $707,250 in fees for 2050 hours of time and $20,364.78 in costs. The trial court stated that this amount was "fair and reasonable . . . considering the complexity, difficulty and entirety of the circumstances of the case." CP at 6400.

Julia appeals her award of fees.

ANALYSIS

Julia argues that the trial court abused its discretion by reducing her requested fees from $513,231.70 to $20,000 after determining that an award of fees was equitable. Julia asserts that due to the actions of the proponents of the false December 2018 Will, she was forced to litigate in order to defend her interests at stake in the will contest.

I.     LEGAL PRINCIPLES

RCW 11.96A.150 is the controlling statute in this case. The statute provides:

(1) Either the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings. The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable. In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.

RCW 11.96A.150. We examine a discretionary award of attorney fees and the reasonableness of that award for an abuse of discretion. *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012). Under RCW 11.96A.150, a trial court has discretion to make an award that it determines is equitable to "any party." Further, the court is permitted to consider "any and all factors" that it deems relevant. RCW 11.96A.150. Absent a clear showing based on the facts and circumstances that a trial court abused its discretion, we will not disturb a trial court's fee determination. *In re Estate of Black*, 153 Wn.2d 152, 173, 102 P.3d 796 (2004). A trial court abuses its discretion when its decision is manifestly unreasonable, exercised on untenable grounds, or for untenable reasons. *In re Guardianship of Lamb*, 173 Wn.2d 173, 189, 265 P.3d 876 (2011).

When determining an appropriate award of attorney fees, "the trial court begins by figuring out the lodestar (total number of hours reasonably expended, multiplied by the reasonable hourly rate of compensation)." *Moran v. Kingen*, 166 Wn.2d 526, 539, 210 P.3d 995 (2009). Especially in complex cases, "it is the trial judge who has watched the case unfold and who is in the best position to determine which hours should be included in the lodestar calculation." *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 540, 151 P.3d 976 (2007). The party requesting fees bears the burden of proving the reasonableness of the fees. *Mahler v. Szucs*, 135 Wn.2d 398, 434, 957 P.2d 632 (1998), *overruled on other grounds*, *Matsyuk v. State Farm & Cas. Co.*, 173 Wn.2d 643, 659, 272 P.3d 802 (2012). A trial court "should discount hours spent on unsuccessful claims, duplicated or wasted effort, or otherwise unproductive time." *Chuong Van Pham*, 159 Wn.2d at 538. Stated another way, attorney fees may be trimmed on a number of different bases including "when the requested fees are deemed excessive, unreasonable or based on work unnecessarily done." *Progressive Animal Welfare Soc. v. Univ. of Wash.*, 114 Wn.2d 677, 689-90, 790 P.2d 604 (1990).

14

II.     ADEQUATE RECORD FOR REVIEW

As an initial matter, Julia asserts that the trial court erred by failing to explain the basis for its award of fees and for failing to include calculations as part of its fee award that would permit us to determine the award's reasonableness. We conclude that there is a sufficient record for review.

A trial court must explain the basis for its award of attorney fees. *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 144, 331 P.3d 40 (2014). This includes "supply[ing] findings of fact and conclusions of law sufficient to permit a reviewing court to determine why the trial court awarded the amount in question." *Id*. at 141; *Mahler*, 135 Wn.2d at 434-35. "[T]he absence of an adequate record upon which to review a fee award will result in a remand of the award to the trial court to develop such a record." *Mahler*, 135 Wn.2d at 435.

In this case, the trial court gave an oral ruling and entered a written order that included findings of fact. The trial court wrote in its findings of fact that it was reasonable for Julia to be represented at depositions and during the trial, "but she was not required to materially participate in the [December 2018] Will contest litigation and could have sat on the sidelines while Amelia Besola pursued the litigation." CP at 6497. The trial court also found that Julia received no benefit from participating in the will contest and expressed its belief that Julia's attorneys effectively worked for Amelia who had already received an award of fees and costs. In its oral decision, the trial court also stated that it was "grossly unreasonable" for Julia to spend more than half a million dollars to contest a will, which if invalidated, meant she would inherit nothing. RP (Feb. 4, 2022) at 18.

Here, the trial court explained the basis for the amount of fees it awarded. The record before us includes findings of fact as well as an oral ruling. Thus, we have an adequate record that

15

we can review and from which it can determine if the trial court erred in reducing the award of fees. Because the record is sufficiently developed, we are able to determine the reasonableness of Julia's award.

III.    REDUCED AWARD OF ATTORNEY FEES

Julia argues that the trial court erred by determining that it was equitable to award Julia fees, but then awarding a reduced award of fees on the basis that Julia was not required to participate in the will contest. Julia contends that she was permitted to participate in the will litigation in order to protect her "individual legal or pecuniary interest." Br. of Appellant at 42. Julia argues that the trial court erred by failing to compensate her for the "harm she suffered in contesting and defending against the fake December 2018 Will." Br. of Appellant at 38.

Julia asserts that she had a "pecuniary interest" in the will contest. Br. of Appellant at 42. Washington case law refers to a pecuniary interest when discussing a litigant's standing to bring a will contest. *See In re Estate of Becker*, 177 Wn.2d 242, 247, 298 P.3d 720 (2013). In a will contest, only a "person interested" may bring a petition to challenge a will. RCW 11.24.010. "[A] 'person interested' is one who has a direct, immediate, and legally ascertained pecuniary interest in the devolution of the testator's estate, such as would be impaired or defeated by the probate of the will or benefited by the declaration that it is invalid." *Becker*, 177 Wn.2d at 247 (internal quotation marks omitted) (quoting *In re Estate of O'Brien*, 13 Wn.2d 581, 583, 126 P.2d 47 (1942)). "In other words, the contestant must stand to lose directly in a financial way if the will which he seeks to attack is permitted to stand." *O'Brien*, 13 Wn.2d at 583.

Here, the trial court considered the impact that the will litigation would have on Julia's interests when determining whether a half million dollars was a reasonable award of fees. The trial court found that Julia would receive no benefit if the December 2018 Will was invalidated.

16

The record shows that Julia informed the trial court at least twice that she stood to receive nothing from a successful will challenge. A trial court is permitted to consider whether expended hours are unreasonable. *Progressive Animal Welfare Soc.*, 114 Wn.2d at 689-90. Here, the trial court determined that awarding a non-will contestant more than half a million dollars in fees for their assistance in invalidating a will under which they stood to receive nothing was unreasonable. The trial court did not abuse its discretion by considering Julia's pecuniary interest and the impact on that interest when it reduced her fee award.[5]

Next, Julia argues that she was forced to litigate due to the actions of the proponents of the false December 2018 Will, and therefore, the trial court erred by determining that she was not required to materially participate in the litigation. Specifically, Julia argues that she had to defend the cross-claims brought against her by Pula, McGraw, and the Estate.

Julia faced two cross-claims, one for contesting Pula's appointment as a personal representative and one for her receipt of the Phoenix stock from Amelia. Before the trial court, Julia argued that the Phoenix litigation contributed to a significant part of her defense with regard

---

[5] On appeal, Julia raises alternative interests she had in order to support her need to litigate the December 2018 Will. First, she argues that under the December 2018 Will, the residual estate, including Mark's partnership interest in Besola Enterprises flowed to Pula, McGraw, and the two charities. Julia contends that she had an obligation to determine if Mark's partnership interest was properly transferred. This argument fails to show that the trial court erred in concluding that Julia's fee request was "grossly unreasonable" due to the fact that, again, Julia stood to receive nothing if the December 2018 Will was invalidated. Further, Amelia was a part of this same partnership. The trial court observed that Amelia, was already prosecuting the case "[t]oo vigorously" and Julia could assist Amelia without amassing attorney fees. RP (Feb. 4, 2022) at 22. Also, Julia argues that she deserved an increase in the award of attorney fees because she "successfully fought to have [Mark's] estate disbursed in accordance with his true wishes." Br. of Appellant at 45. But again, the trial court determined that Julia's desire to have Mark's true desires vindicated did not support a basis for an increase in the award of fees, because Amelia actively litigated to ensure this result.

to the claims. Litigation that took place regarding the Phoenix shares stemmed from Estate's efforts to have shares returned. The trial court entered orders requiring Julia to return the stock to the Estate. Julia contends that her actions in fighting to retain the stock benefitted the Estate. Nevertheless, the trial court never made a finding that it believed the litigation benefited the Estate nor a finding that it determined the litigation necessary and reasonable. The record shows that the trial court stated that the litigation concerning the Phoenix stock "was an infinitesimal part of this litigation. That was a tiny part of this litigation." RP (Feb. 4, 2022) at 16.

Here, the trial court was in the best position to determine whether Amelia's and Julia's actions in contesting the return of the stock did in fact benefit the Estate and determine whether it considered the litigation as productive and necessary hours deserving of compensation. *Chuong Van Pham*, 159 Wn.2d at 540. The trial court was also in the best position to weigh the significance of the litigation against the more than two years of motions, hearings, and trials that took place. *Id*. There is no evidence that the trial court determined to rely on the cross-claims as a basis to increase its award of fees. Because the trial court was in the best position to determine whether hours spent litigating with regard to the Phoenix stock deserved compensation or counted as material participation, we conclude that the trial court did not abuse its discretion by refusing to increase its award of fees.

Next, Julia argues that the trial court erred in concluding that her counsel effectively worked for Amelia. Julia emphasizes that her attorneys performed work that was not duplicative of that performed by Amelia. She contends that the efforts of her attorneys in litigating and defending against the December 2018 Will were tailored to her position as beneficiary, grantee of Phoenix Stock and as a partner in Besola Enterprises.

The record supports the trial court's finding that Julia's counsel worked, in effect, for Amelia. First, notwithstanding the fact that Julia stood to receive nothing by contesting the December 2018 Will, once Amelia filed her petition challenging the Will, Julia maintained an active position in the will contest, including objecting to the appointment of personal representatives and strategizing in order to assist Amelia's counsel. Additionally, Amelia acknowledged that she had paid Julia's attorney during the course of litigation. In August 2020, Amelia stated that she paid Julia's attorney 90 to 95 percent of his fees. At the hearing on attorney fees, Julia's counsel informed the court that he received payment from *both* Amelia and Julia, and he was unable to say who paid him more money or whether Julia had paid him with money from Amelia. Because the record shows that Amelia not only paid Julia's counsel but that Julia's counsel worked to challenge a will under which Julia stood to receive nothing, the facts and circumstances of the case support the trial court's decision. This argument fails.

Finally, Julia argues that the trial court erred in reducing her award of fees because the fee award conflicts with the trial court's order that Julia had the right to have counsel at her deposition and trials. She contends that the $20,000 award failed to compensate Julia for the costs of having representation at trial, depositions, and hearings, which the trial court acknowledged was reasonable.

Julia cites *Seattle-First Nat. Bank v. Wash. Ins. Guar. Ass'n*, 94 Wn. App. 744, 762, 972 P.2d 1282 (1999), for the proposition that this court will "reverse an award of attorney fees if the record fails to mention the method the trial court used to calculate fees or if the court used an improper method." In *Seattle-First*, two parties, Seattle-First National Bank (SeaFirst) and American leasing Company (ALC), prevailed and only SeaFirst was entitled to receive contractual attorney fees. *Id*. The trial court agreed with a "blanket statement" from counsel that SeaFirst

should receive 92 percent of the apportioned fees and ALC should receive 8 percent. *Id*. at 763. On appeal, this court found that no basis existed for this "skewed apportionment." *Id*.

Unlike in *Seattle-First*, the trial court here did not accept an unsupported blanket proportion and rely on improper criteria for its fee award. The trial court's written findings of fact, stated that it was "reasonable for Julia Besola-Robinson to be represented by counsel during her depositions and during the trial itself, but she was not required to materially participate in the Will contest litigation." CP at 6497. The trial court also stated in its findings of fact that Julia's counsel effectively represented Amelia, and Amelia had already received an award of attorney fees and costs, and therefore, should not be further compensated. Consideration of proper factors such as unnecessary or unreasonable work and an excessive request for fees led to the reduction in fees at issue in this case. In arguing that the $20,000 award failed to compensate her for representation by counsel at hearings and trial, Julia fails to point to any specific time record or provide any calculations or analysis to show what a reasonable award would be for monitoring the litigation. Here, the trial court concluded that $20,000 was reasonable even though it determined that Julia's counsel effectively worked on behalf of Amelia. The trial court awarded Amelia $707,250 in fees and $20,364.78 in costs. The trial court determined that Amelia should receive no further fees. Therefore, Julia's argument fails.

A trial court is permitted to consider "any and all factors" that it deems relevant when determining an award of fees. RCW 11.96A.150. Here, the trial court could properly consider an excessive or unreasonable request for fees as well as work considered unnecessary as bases to reduce a fee award. *Progressive Animal Welfare Soc.*, 114 Wn.2d at 689-90. The trial court ultimately determined that Julia's counsel, in effect, represented Amelia and Julia was not required to participate in a will contest, which if successful, meant she would receive nothing. After a more

20

than two-year period of litigation that included complex facts and a truncated trial, the trial court was in the best position to determine the award of fees in this case. Because the trial court relied on proper factors that it deemed relevant for a reduction in fees, we hold that the trial court did not abuse its discretion.

## ATTORNEY FEES ON APPEAL

Julia requests an award of attorney fees on appeal pursuant to RCW 11.96A.150 and RAP 18.1 if she is successful on appeal. RCW 11.96A.150 permits us to authorize fees on appeal. Julia argues that her efforts below benefitted the Estate and she should not be penalized for her active participation the TEDRA litigation below, which was required due to the actions of the proponents of the December 2018 Will. Because we hold that the trial court did not err in reducing the amount of fees awarded to Julia, we decline to award fees on appeal.

## CONCLUSION

We affirm

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Lee, J.

Glasgow, C.J.

21